1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4    ------------------------------------
                                         ) CRIMINAL NO. CR14-00291
5    UNITED STATES OF AMERICA,           ) COURTROOM 5A
                                         ) U.S. FEDERAL COURTHOUSE
6                                        ) MOBILE, ALABAMA
     VS.                                 ) JUNE 03, 2015
7                                        )
     KIMBERLY SMITH HASTIE;              )
8    RAMONA MCARDLE YEAGER,              )
                                         )
9              DEFENDANTS.               )
     ------------------------------------)

10

11                  TRIAL - DAY 07
              PAGES 1468 TO 1609, INCLUSIVE
12
          BEFORE THE HONORABLE KRISTI K. DuBOSE
13           UNITED STATES DISTRICT COURT JUDGE

14
     APPEARANCES:
15
     FOR THE GOVERNMENT:    Gregory A. Bordenkircher, Esq.
16                          Sinan Kalayoglu, Esq.
                            Lillian Stewart, Esq.
17                          Assistants U.S. Attorney
                            U.S. Attorney's Office
18                          63 South Royal Street, Suite 600
                            Mobile, Alabama  36602
19
     FOR DEFENDANT KIMBERLY SMITH HASTIE:
20
                            Neil L. Hanley, Esq.
21                          Neil Stewart Hanley, Esq.
                            Hanley Law Firm
22                          158 Congress Street
                            Mobile, Alabama  36602
23

24

25

1   APPEARANCES CONTINUED:

2   FOR DEFENDANT RAMONA MCARDLE YEAGER:

3                            Dennis J. Knizley, Esq.
                             7 North Lawrence
4                            Mobile, Alabama  36602

5                            Jason B. Darley, Esq.
                             Darley & McGough, LLC
6                            1751 Dauphin Street
                             Mobile, Alabama  36604

7

8   Also present:  Elizabeth Stepan, Law Clerk

9   COURT REPORTER:          Melanie Wilkins, RMR, CRR
                             Official Court Reporter
10

11          Proceedings reported by machine stenography.

12              Transcript produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        [June 03, 2015, 8:08 a.m.  The defendants are present with
 2        counsel in open court.]
 3        [Out of the presence of the jury in open court.]
 4             THE COURT:  Okay.  I spent a great deal of time on
 5   this last night, and I feel strongly that the Government is
 6   lacking in their case on the extortion.  However, I'm going to
 7   let the case go to the jury.  And I'm going to talk a little
 8   bit this morning about what I want us to fully brief and fully
 9   talk about tomorrow, as I'm assuming the defendant, if a jury
10   returns a verdict of guilty, will reurge this motion.
11             MR. N. HANLEY:  Yes.
12             MR. KALAYOGLU:  Yes, Your Honor.
13             MR. S. HANLEY:  Yes.
14             THE COURT:  And I want to give the Government some
15   questions to think about and answer them.  I know we've all
16   been very busy this trial and haven't had a lot of time to
17   write Law Review articles or things of that nature, but this is
18   a very serious issue.  And I think that there's some real
19   deficit in the Court's -- I mean, in the Government's proof
20   here.  Let me explain why I think that.
21             Let's start with McCormick, which came out in 1991.
22   It was the Supreme Court case which involved the Hobbs Act.
23   And the Court said -- and it involved campaign contributions --
24   those were the two pertinent facts.  And it said that a quid
25   pro quo, the agreement, must be explicit.
```

1     And it explains why.  Otherwise, every public

2 official is subject to every time they take a campaign

3 contribution and then, perhaps, introduce legislation that's

4 favorable to the person that gave them that campaign

5 contribution, they are subject to the prosecutor, or the U.S.

6 Attorney's Office, in believing it's a bribe and bringing an

7 extortion charge.  And they said we can't have that because for

8 30, 40 years, it's been legal to do that.  So we are going to

9 require that there be an explicit promise made, an explicit

10 agreement.

11     Then we had Evans come out the next year, and in the

12 Evans case, it's very important that we think about what the

13 Supreme Court was dealing with there.

14     What happened in that case is you had a public

15 official who never made a request, never made a request for

16 anything, and then you had the F.B.I. agent that was posing as,

17 I don't know, a real estate developer or something, anyway,

18 wanting some property rezoned.

19     And so he was approached and made an explicit request

20 of this public official numerous times.  It happened over a

21 series of times.  They kept making this request to the public

22 official.  The public official never asked for anything, but

23 then the F.B.I. agent, posing as the developer, handed him

24 $7000 in cash and then $1000 check.

25     What the Supreme Court was faced with is their

1472

1    language that it had to be an explicit agreement, and in that

2    case we had silence by a public official.  So in that case they

3    said, well, in that case the public official never asked for

4    anything.  And they were talking about inducement.  What was

5    the express or explicit inducement there.

6          And, there, they said, well, there was a -- the bribe

7    giver made a specific request, and they held that the

8    acceptance of the bribe was an implicit promise to use the

9    official's position to do what the developer wanted.  So in

10   that case we had silence by the public official but then a

11   request by the briber.

12         Now, in our situation, we have a request by the

13   public official but silence by the briber or by the person who

14   paid, the payor, we'll call him.

15         So then we get to Siegelman where the 11th Circuit

16   is trying to sort all this out.  But the first thing I think we

17   need to remember about Siegelman is that Siegelman is not a

18   Hobbs Act case.  Siegelman is a 666 case, which when we go back

19   to the Supreme Court in McCormick, it's a Hobbs case.

20         At the end of the day, Siegelman says that "explicit"

21   can mean "implicit," which I can't wrap my mind around that,

22   but that's what they say.  And I'm bound to follow the

23   11th Circuit law to the extent it applies to our case.

24         So my first thought is that Siegelman doesn't apply

25   because it's not a Hobbs Act case.  And if I go back past

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

1   Siegelman to McCormick, it's clear, especially in the campaign

2   contribution arena, that there has to be an explicit promise.

3   And that's why I feel the Government's proof is lacking.

4          Now, in Siegelman, I think it's worthy of talking a

5   little bit about Siegelman.  In Siegelman, we had a public

6   official's agent who communicated -- well, first of all, we had

7   the payor who was fairly explicit in that he wanted to be on

8   the CON Board, the Certificate of Need Board, and he needed to

9   contribute in order to be able to retain his position on the

10  Certificate of Need Board.

11         And then we had the public official's agent who said

12  that a contribution would ensure a favorable look on that

13  request.  So in that situation it was not express, a tit for

14  tat, but could be inferred because of the words and actions of

15  the public official, the public official's agent, that they

16  were talking about the same thing and that a jury, a reasonable

17  jury, could take those two different actions and put them

18  together since they were, you know, of the same mind and,

19  therefore, have an express -- excuse me -- an explicit

20  agreement.

21         Here, again, we are not talking about a Hobbs Act

22  violation.  But assuming that the 11th Circuit would apply,

23  there's a Siegelman rationale to a Hobbs Act violation.  And I

24  think that a good argument could be made that they would.

25         We still have the situation of a lack of proof that

1  is at the level of Siegelman because we -- I keep asking what

2  the actions and words are of the public official in our case,

3  and I'm not satisfied that that question has been answered.

4          But, anyway -- so that's my thought.  That's my

5  thought process.  It would be good if the Government and the

6  defense had time to read those three cases thoroughly and also

7  make sure that there's not something else out there in the

8  11th Circuit, post-McCormick, that I should be looking at

9  that would help change my mind.

10         And I would also point you to a very good Law Review

11  article that sort of helps put this in perspective.  It's

12  65 Rutgers Law Review 229.

13         So, with all that said, my intention would be that we

14  would, according to what the verdict is or if we receive a

15  verdict -- whether we receive a verdict today or not, if the

16  Government would be prepared and the defense would be prepared

17  to discuss my preliminary thoughts on this motion tomorrow at

18  9:00 o'clock.

19         I think that would give you adequate time for

20  everybody to read these cases.  You'll have an opportunity to

21  correct my analysis if I've misunderstood something about one

22  of the cases, and also, I believe, this would be the fair way

23  to proceed because if I am incorrect, it gives the Government

24  the opportunity to convince the 11th Circuit that I am

25  incorrect.  So the motion is still under advisement.

1      MR. KALAYOGLU:  That's fair, Your Honor.

2      THE COURT:  All right.  Anything else from the

3  Government?

4      MR. BORDENKIRCHER:  No, Your Honor.

5      MR. KALAYOGLU:  No, Your Honor.

6      THE COURT:  All right.  Let's take ten minutes and

7  get ready for our jury to come up.

8      [Recess.]

9      [In open court in the presence of the jury.]

10      THE COURT:  All right.  Please be seated.

11      Mr. Bordenkircher -- Mr. Kalayoglu.

12      MR. KALAYOGLU:  Thank you, your Honor.

13      Good morning.

14      MEMBERS OF THE JURY:  Good morning.

15      MR. KALAYOGLU:  So thank you for your patience.  I

16  know that there's been a lot of information that's been thrown

17  at you over the past week.  You've heard about accounts.

18  Invoices, Mobi-Media, Strategy, Strateco, $1.25 fund.  You've

19  heard testimony from a wide range of people on a wide range of

20  things.

21      And it may be a lot to take in.  Fortunately, you

22  don't have to remember everything.  Not everything that's

23  happened in this court is really all that important because

24  what you need to do is, at the end of all this, to go back and

25  deliberate about what the charges are and what the United

1    States needs to prove.

2           So what I want to do in the next 30 minutes is

3    explain to you what it is that we've got to prove and show you,

4    with some of the exhibits, just some of the highlights here and

5    match that up with what it is that we've got to prove and prove

6    to you that we've met our burden.

7           All right.  Let's start with Count 17.  I'm going to

8    work backwards from the indictment.  Count 17 was the E-mail

9    address disclosure leak from Kim Hastie.  That's the violation

10   of the Driver's Privacy Protection Act.  That's how we started

11   our case.

12          You heard testimony from Brad Bray.  He's the I.T.

13   employee.  You heard testimony from the Sandy Stimpson campaign

14   team.  That's Candace Cooksey.  You heard from James Arendall.

15   He's the guy who sent out the E-mail blast.  You heard that

16   WKRG clip.  You've heard the testimony from the victims who got

17   that E-mail blast E-mail from Kim Hastie.  That's Joe Busta.

18   You heard from Phil Lambert.  You heard from Cissy Hartley.

19   Even the Revenue Commissioner Marilyn Wood got an E-mail.

20          The evidence is undeniable that Kim Hastie is the one

21   who ordered Brad Bray to get those E-mail addresses on a thumb

22   drive and turn them over to the Sandy Stimpson campaign team.

23   The evidence is undeniable.

24          Why is it?  Because it's not being denied by defense

25   counsel.  Not a single time in opening statement did defense

```
 1    counsel mention the fact that there's something called the

 2    Driver's Privacy Protection Act.  Not a single time.  It's

 3    posted on the Web site, ladies and gentlemen.  It's posted on

 4    her Web site.

 5           And, also, you'll remember the testimony from Brad

 6    Bray.  When you go in to renew your tags online, you've got to

 7    put in your E-mail address twice.  That's personal information

 8    that's being provided to the License Commission that's being

 9    used by Kim Hastie for an impermissible purpose, namely to

10    promote her political agenda so that she, in this case, can

11    show her support for Sandy Stimpson.  But she did it in an

12    unlawful way.

13           There was no cross-examination on any of these points

14    from defense counsel.  The only cross-examination was from Brad

15    Bray, and it was for matters unrelated to this.  So Count 17 is

16    done.  Cross this off.  One is done.  This one is easy.

17           Okay.  The next one in your jury instructions is

18    Count 16, working backwards.  That's the lie from Kim Hastie to

19    Special Agent Ketrick Kelley.  That was on July 16 of last

20    year.  That was during the execution of the search warrant.

21    And Kim, when asked by Special Agent Kelley, if Kim had ever

22    instructed Victor Crawford to pad his bill to offset the cost

23    of Christmas gifts, she said, "No, I didn't."

24           How do we know that's a lie?  Well, not only do you

25    have the testimony of Special Agent Kelley on this, which was
```

1   recorded, you've also got Victor Crawford up here telling you

2   that's a lie because he told you that Kim Hastie instructed him

3   to pad his hours to offset the cost of Christmas gifts.  That's

4   what he said.

5           And it's your job, as jurors, to evaluate the

6   credibility of witnesses.  This is an important point.  Was

7   Victor Crawford telling the truth up there?  He was up there

8   for a while.  He was up there on cross-examination for a whole

9   day.  Even though he's not the one on trial here, he was up

10  there for a whole day.  Ask yourself, not just on this point

11  but on all points, was Victor Crawford telling the truth?  Is

12  he a guy that is lying to you, or do you think he's telling the

13  truth?  If he's telling the truth, that means Kim Hastie is

14  lying.

15          Not only that, as it relates to this count, we also

16  have the recording between Victor Crawford and Ramona Yeager.

17  That's the one that he took on his phone, and that's where he's

18  telling Ramona Yeager, "Kim is coming to me, and she wants me

19  to pad my hours to offset this, and I don't want to do that."

20          And Ramona goes, "Yeah.  But did you do it?"

21  Clearly, this is an issue that Kim Hastie knows about.  She

22  lied about it.  It's a material false statement to the F.B.I.

23  It's not the only one we have, ladies and gentlemen.

24          Mr. Bordenkircher will get into that later, but just

25  to give you another example, Special Agent Ketrick Kelley went

1   up to Kim Hastie at the License Commission and asked her, "Were

2   you authorized to pay Jonathan Gray from Strategy out of the

3   $1.25 fund."  She goes, "Oh, absolutely."  Blatant, blatant

4   lie.  That's Count 16.

5          The next ones I'm going to group together.  That's

6   Counts 10 through 15.  Those are the Christmas gifts, and then

7   Count 15 is the extortion for the $1,800 qualifying fee.

8          All right.  Extortion.  What does that mean?  If you

9   turn to -- it's on the jury instructions.  I have got to prove

10  three things.  One, that the defendant caused Victor Crawford

11  to part with property.  Undeniable.  Victor Crawford purchased

12  those gifts.  He got the $1,800 payment and made it to Kim

13  Hastie; right?

14         We've got to show that these transactions affected

15  interstate commerce.  That just means -- you'll recall the

16  testimony of Kathy Scott.  Victor Crawford went and paid with a

17  credit card.  He went to Best Buy, Sam's Club, hh Gregg, and

18  those transactions affected interstate commerce is what you

19  heard from Kathy Scott, and there's no evidence to the

20  contrary.  So you've got that.

21         And the third we've got to prove is that this

22  extortion was done under color of official rights.  What does

23  that mean, "color of official right"?  And the judge will tell

24  you it's the wrongful taking or receipt of money or property by

25  a public officer.  "Public officer" being the elected public

1480

1   official -- that's Kim Hastie -- who knows that the money or

2   property was taken or received in return for doing or not doing

3   official acts.

4          There's got to be an agreement here.  It's sort of a

5   quid pro quo.  "You do this, and I'll do this."  What's the

6   quid pro quo?  Victor is expected and required to purchase

7   these gifts, these items, for Kim Hastie.  He's expected and

8   required to pay the $1,800; in return, she's not going to fire

9   him.

10         Victor Crawford made this abundantly clear to you,

11  ladies and gentlemen.  He was in fear of loss of employment.

12  He said this time and time again.  He actually said on the

13  stand that she's directly threatened him before.  You've heard

14  about the hostile work environment that she's created.

15         You've heard about her ultimatums.  It's her way or

16  the highway.  By other own admission -- by her own admission to

17  Special Agent Kelley, she told Agent Kelley when asked about

18  Victor Crawford and if she's ever threatened to fire him, she

19  tells him, "Oh, I threaten him he could lose his job a thousand

20  times," as if it's some sort of joke or something.

21         But it's not.  The reason we know it's not a joke is

22  because Victor Crawford was in fear for loss of employment.

23  Look at his contract.  He's an at-will contract employee of the

24  County who provides services to the License Commission.  That's

25  his sole customer.  That's his sole source of revenue.  If he

1  loses that, he's out.  He's out big time.  Okay?  He needs to

2  work at the License Commission, stay in good graces.

3        But remember his testimony.  His testimony is that he

4  didn't want to fall out of favor because for Kim Hastie it's

5  all about loyalty.  "Victor, I'm going to say this now with the

6  Ramona in the room, don't leave me stranded or I'm going to

7  find you and I'm going to hunt you down.  Don't you leave me

8  hanging."  That's just one example that we have in a recording,

9  which you're going to have an opportunity to go back and listen

10 to.

11        Now, the jury instructions talk about there's got to

12 be some sort of explicit promise here.  Okay.  But then the

13 instructions also talk about that you can look at Hastie's

14 words and actions over the course of time.  You can look at her

15 words and actions.

16        Mr. Crawford has made it clear to you in no uncertain

17 terms that he felt he was required to get these gifts.  They

18 were not, as defense counsel has told you, donations.  They

19 were not donations at all.  He wasn't donating anything.  He

20 had to get these items.  These requests were made in Kim

21 Hastie's office.  She passed him a little note.  Get this, get

22 this, get this.

23        You also have the testimony of Crystal Foley.  That's

24 Kim Hastie's secretary, and she told you that Kim Hastie told

25 her to go prod Victor Crawford and pester him for that T.V.

1   back in 2010.

2           It's a pattern of behavior.  These are not innocent

3   requests.  These are not innocent mistakes.  It happened in

4   2009, which is what Victor Crawford testified to you.  2010,

5   2011, 2012, 2013, not just for the Kindle Fire and the iPad but

6   also for that $196 payment to offset the costs of the Christmas

7   party at the Ashbury Hotel & Suites.  We've got that.

8           You've got Katie Williamson's tuition payment for

9   Auburn.  She's extorting him time and time again because she

10  knows she can.  She's exerting leverage over him time and time

11  again.  That's what Counts 10 through 15 are all about.

12          Now, Counts 1 through 9.  Counts 1 through 9, I'm

13  just going to group together.  That's all the same scheme to

14  defraud Mobile County.  It starts with the conspiracy between

15  Ramona Yeager and Kim Hastie to defraud Mobile County.

16          How do they go about that?  They go about that by,

17  No. 1, not having a written contract with these consulting

18  firms -- Strateco, Strategy, Mobi-Media.  It's all verbal.

19          And heard from Michelle Herman.  You heard from

20  Marilyn Wood.  You've got to get written contracts.  These are

21  people who have worked for government for a while.  In Ramona

22  Yeager's case, she actually worked for over 40 years at the

23  License Commission.  They know how this is supposed to work,

24  ladies and gentlemen.

25          But they violated the rules.  They wanted to trick

1  and deceive the County Commission and use taxpayer dollars to

2  pay for services that they are not entitled to and not even

3  giving the taxpayer an opportunity to weigh in on it.  It's all

4  to promote Kim Hastie's political agenda of combining the

5  offices of the License and Revenue Commission, at least as it

6  relates to Strateco and Strategy.

7           Remember in 2012?  It was the test run.  That was

8  with Mobi-Media.  That's how this all got started was Kim

9  Hastie and Ramona Yeager tested the waters.  They wanted to see

10  if they could get away with their scheme to defraud Mobile

11  County by falsifying Victor Crawford's bill in submitting that

12  to the County and signing off on those invoices.  And you know

13  what?  They succeeded.  They used Victor Crawford as a

14  straw man in 2012.  So they used Victor Crawford as a straw man

15  again in 2014, even though there was no cooperation, no

16  collaboration between Victor Crawford and Chad Tucker.

17           That is a very important part of this case, ladies

18  and gentlemen.  No collaboration.  No cooperation between

19  Victor Crawford and Chad Tucker.

20           Defense counsel has gone time and time again back to

21  this contract with Victor Crawford.  "You see what it says

22  here?  You see where it says here where you can have personnel?

23  Well, that's what Chad Tucker is.  He's Victor Crawford's

24  personnel."  Come on.  You've heard from Chad Tucker:  "I'm not

25  a subcontractor of Victor Crawford."  You heard from Wes

1   Gunter: "I didn't even know who Victor Crawford was until

2   three months after the fact."

3           You heard from Victor Crawford. "Yeah, I never used

4   Chad Tucker for services." Victor Crawford is a computer

5   programmer. Did you hear any testimony about Chad Tucker being

6   a computer programmer? Did you hear any testimony about Victor

7   Crawford being some sort of computer programmer? Just because

8   you've got social media doesn't mean that everything gets to

9   roll through I.T. like Kim Hastie wants. What I'm referring to

10  is there is a recording. We've got lots of recordings, and

11  you're going to have a chance to listen to them. But what I'm

12  referring to there is Kim Hastie saying let's have it all flow

13  through I.T. That's how we are going to do it.

14          The recordings are super important. You are going to

15  have a chance to listen to them over and over again. The

16  defendants are making their intent abundantly clear. They know

17  what's going on. They know that they are trying to trick and

18  deceive. And they are saying it. They are saying it. They

19  are saying stuff like, "I don't want Merceria to see this,"

20  Merceria Ludgood being the County Commissioner. That's Kim

21  Hastie's statement.

22          What about Ramona Yeager's statement? We've got a

23  recording with her on video, on video, where she's saying, John

24  Pafenbach, I don't want him to think that we are doing

25  something underhanded.

1     Come on, ladies and gentlemen.  This is a scheme.

2     They know what they are doing.  They are telling you what they

3     are doing.  We are showing to you -- we've got Kim Hastie on

4     video back in April of 2014 with Victor Crawford.  "Come here,

5     Victor.  Let me show you how I want this invoice to be changed.

6     I don't want it to say my name.  I want it billed to Bienville

7     Rock Software.  It can't say this.  I want it to say this."

8          I'm going to show you a timeline in just a second,

9     but one thing about Ramona Yeager I want to make sure that

10    things are not lost in the weeds here.  She's certainly a part

11    of this conspiracy.  She knows what's going on.  Defense

12    counsel made this point in opening statement:  She's got no

13    motivation to be involved in this.  She's got no motivation to

14    trick and deceive the County Commission.

15         She does have motivation.  What's her motivation?

16    She wants to stay in Kim Hastie's good graces because we know

17    what kind of leader Kim Hastie is.  Either you are loyal to her

18    or you are not.  If you are on Team Hastie, you are going to be

19    just fine, but you've got to do things unlawfully.  If you are

20    not on Team Hastie, you've got what happened to Victor

21    Crawford, where he was so fed up with the public corruption, so

22    fed up with what's been going on that he had to go to the

23    authorities.

24         Ramona Yeager was in charge of the day-to-day

25    operations of the License Commission.  She's worked there for

```
1    40 years.  She knows the ins and outs of the County business.

2    She had E-mail responses.  Phone calls.

3            You heard from Wes Gunter when asked by the attorney,

4    Mr. Bordenkircher, do you know -- did you correspond with

5    Ramona Yeager at all?  "Oh, yeah, plenty of meetings.  I

6    corresponded with her all the time."  So that's Ramona Yeager's

7    involvement in all of this.

8            Now, let me go and show you this timeline here.  I

9    did a timeline back in the beginning in opening statement, if

10   you'll recall.  Let's move this up here.  I know there's a

11   bunch of stuff going on.  We'll walk through it.  It's a little

12   more involved.  The initial timeline was less stuff.  This has

13   more stuff.  The reason we put it like this is because we've

14   shown you some of the evidence.

15           And so, remember, it's color-coded.  Color meaning

16   different -- the same scheme.  So this is Mobi-Media back in

17   2012.  This is the test run.  Here, we've got Strateco over

18   here.  Same thing.  Right?

19           The purple refers to Strategy.  That's the $1.25 fund

20   stuff that we talked about.  John Gray was paid out of the

21   $1.25 fund.  That's what that is.

22           The green refers to the extortion.  So I'm going to

23   work through this quickly.

24           First up are these green items right here.  42-inch

25   LCD T.V.  40-inch LCD T.V.  Kindle Fire.  37-inch.  Victor's
```

1  check to the Ashbury Hotel & Suites.  That's all reflected in

2  Government's Exhibit No. 43A.

3          Here, you've got the receipts.  We showed them to

4  you.  It's proof positive that he's gone to purchase these

5  items.

6          All right.  Next up, here, Mobi-Media Invoice 103,

7  $10,500.  You've got the correspondence.  This is Exhibit 59.

8  Exhibit 59.  You've got the E-mail correspondence between

9  Mobi-Media and Victor.  Chad Tucker and Victor.  Sticky note

10  here.  "Ramona, Chad Tucker bill needs to be on this.  Please

11  put these two together and get on this bill.  Thanks, K."

12  That's Kim's note to Ramona.  That is back in 2012.  Services,

13  $10,500.  This is Mobi-Media services for $10,500.

14          Look over here, Web and social media expenses.

15  $10,500 on Victor's bill.  This is the fraud.  This is the

16  fraud.  APL's bill, $10,500.  They didn't do that.  We know

17  that Victor did not do Web and social media expenses.  We know

18  this.  We told you this.  That's what this one is.

19          Same thing here, Exhibit 176.  You've got some more

20  E-mail correspondence.  Government's Exhibit 60.  This is what

21  was actually submitted to the County.  Do you remember here I

22  had Michelle Herman from the County Administrator's Office

23  talking about what they received?  Right here.  It's what they

24  received.  Kim Hastie signs off on this.  Couldn't be anymore

25  clear.  $10,500 worth of work that Victor Crawford did not do.

1   This is what they relied upon.  She said that they relied upon

2   the representations made by the elected officials.  Done.

3          61A.  This is Count 1 now.  This is the check.

4   Exhibit 61A.  This is the check from APL to Mobi-Media.  This

5   is Victor's check to Mobi-Media.  Why did he pay this?  Because

6   Kim Hastie told him to.  It's that simple.

7          Now, you get to here.  Exhibit 49.  Exhibit 49.  This

8   is the House Bill for the $1.25 fund.  Do you remember with

9   John Gray I had him read Section 2?  This is a segregated

10  account.  It can only be used for preservation and storage of

11  records for the motor vehicle registration, boat registration.

12  There's no description of consulting services or any of that.

13  Kim Hastie knew this.  She was the one who pushed this bill

14  through.

15         How do I know that?  The next exhibit, 51A.  Hastie

16  booklet to Mobile County Commission.  This is her letter to the

17  County Commission saying please accept this letter as my

18  request for approval for a $1.25 increase to our tag and

19  issuance fee for the Mobile County License Commission.  She

20  says it's for kiosks, computer programming, programming,

21  computer systems -- nothing involving anything like that.  No

22  descriptions of lobbying here.  None.  She knows this bill

23  better than anyone.  She went to the County Commission.

24         Next up, Government's Exhibit 44A, request for

25  Christmas gifts, December 2013.  Look at this Post-it note.

1   Victor, 37, iPad tablet, Kindle.  Also look at this Post-it

2   note.  "Victor, I need for you to send Katie to this.  Thanks,

3   Kim," wanting Katie Williamson to go to Auburn on Victor's

4   dime.

5           Next up, Government's Exhibit 101.  Right here.  Do

6   you have a personal E-mail account?  This is Chad to Kim

7   Hastie.  This is the start of Kim Hastie's campaign to run for

8   Revenue Commissioner in that combined office.  Personal E-mail

9   account.  And then the launch plan.  This is Government's

10  Exhibit 103.  Government's Exhibit 103.  Hastie hires Strateco,

11  LLC.  There's a launch plan.  This is all about combining the

12  offices.  This is overtly political.

13          Why do I keep talking about overtly political?  We

14  made a whole thing about it because you can't use County funds

15  to fund your own personal political agenda without the

16  knowledge of the County Commission or the taxpayers.  And

17  that's exactly what she's doing.  This is not just innocent Web

18  and social media for the License Commission.  This is to

19  further her own political agenda, and we have it here in

20  writing.  This is a launch plan with talking points about the

21  merger.

22          Next up, January 31st, 2014.  You've got

23  Exhibit 47A.  This is the check that Kim Hastie required that

24  Victor Crawford pay for her qualifying fee so that she can get

25  on the ballot.  It's right here.

1       Right here, Strategy invoice, combining the office

2   cost reduction strategy.  This is a picture of the invoice.

3   This is what John Gray -- his revised memo on here, the

4   description.  "Please pay this out of the $1.25 fund, the DL

5   one.  Thanks, Kim."  It couldn't be any more clear what her

6   intent is to pay this out of an -- unlawfully pay this out of a

7   restricted account.

8       Do you remember John Gray?  He was the consultant guy

9   who told you that he spoke with Kim Hastie and that she told

10  him, "Oh, I've got a discretionary account I can pay you out

11  of.  I can pay you."  This is not a discretionary account.

12  This is a segregated account, and she knows better.  Proof

13  positive right here.  Exhibit 55B.

14       THE CLERK:  Sinan.

15       MR. KALAYOGLU:  Government's Exhibit 62, this is

16  Strateco Invoice 222.  It's billed -- I know we can't see it.

17  It's small, but it's billed from Strateco to the Mobile County

18  License Commission.  It was sent to Kim Hastie.  Remember that

19  summary chart that we prepared with each of the invoices, and

20  we had Kathy Scott, the forensic accountant, go through them

21  one by one?

22       First, it goes from Kim, changes to Bienville Rock,

23  and then changes back to this.  "I don't want it to say Kim

24  Hastie, consulting retainer because if it's got my name on it,

25  I've got to pay it," which is absolutely true.  But she doesn't

1    want to pay it.  She wants the taxpayers to foot the bill.

2            So you've got all these revisions, all these

3    revisions, and then you are going to see all these revisions.

4    We've got them right here.  Defense counsel wants you to

5    believe that the reason we've got all these revisions is to

6    make the bills more accurate.  Nothing could be farther from

7    the truth.  Kim Hastie and Ramona Yeager want to disguise the

8    true nature of their services.

9            They want Victor Crawford to pay it and then have the

10   County pay back Victor.  So, in other words, the County is

11   footing the bill, at the end of the day, for what Strateco is

12   doing.

13           That's not being accurate, ladies and gentlemen.  She

14   doesn't like that.  You've got her handwritten notes.  "Talk to

15   Victor."  She wants Victor to pay.  And that's when Victor just

16   got fed up, and that's when he went to the federal authorities.

17           Here, we've got the Kim Hastie campaign check.  This

18   is proof that it got deposited.  Let's go to the back here.

19   Proof that it got deposited, $1800.  And we've got lots of

20   different invoices, E-mail responses between Kim Hastie, Wes

21   Gunter, and Ramona Yeager.  On and on it goes.  It's all about

22   the merger.  It's all about the merger for Kim Hastie, and

23   she's very overt about that.

24           Launch plans, PowerPoint presentation, "capitalizing

25   on a rare opportunity to save tax dollars, this really needs to

1    be the focus of the piece."  This is Government's Exhibit 108.

2    This is what all this stuff is right here, this newsletter.

3            We talked about this newsletter before.  Page 1 is

4    somewhat informational.  Page 2 is political propaganda.  This

5    is all about the merger.  This is not permitted if you are

6    going to be using County dollars.  You've got to get permission

7    from the County.  It's polling.  Basically it's a focus group.

8    They want to get information from the people so that she can

9    further her political agenda and get more money and more power.

10           Exhibit 63, different versions of the invoices.  This

11   is what is being paid from Strateco from the Mobile County

12   License Commission.  And on and on and on and on it goes.

13           All the way through here, you've got the check from

14   Strategy paid out of the $1.25 fund.  That's May 29th, 2014.

15   This was received by John Gray.  Then you have the whole thing

16   to cover up to say oh, no, no, no, no.  John -- you recall that

17   recording?  Chad is who we pay.  John, John just does work for

18   us once in a while.

19           That's not true.  That's not true at all.  That's

20   another lie.  It's a cover-up.  You've got the lies to the

21   Lagniappe.  You've got the lies to the F.B.I.  You've got the

22   return payment.

23           Just go through the evidence one by one, ladies and

24   gentlemen.  Go through all of this stuff, all of this stuff,

25   and what you will see is a pattern of behavior.  These are

1   not -- these are not innocent, honest mistakes.  You do not --

2   this is not just someone who doesn't know what she's doing.

3   This is a pattern of behavior running the span of several

4   years.

5           Kim Hastie and her partner in crime, Ramona Yeager,

6   repeatedly tricked and deceived the County Commission misusing

7   funds, stealing taxpayer dollars over and over again.  And so I

8   ask when you go back and deliberate and review all the

9   evidence, you will find beyond any reasonable doubt that the

10  two defendants are guilty of the crimes with which they are

11  charged.  Thank you.

12          MR. N. HANLEY:  Do I start?

13          Good morning, ladies and gentlemen.  I want to

14  sincerely thank you on my behalf and on the behalf of Kim

15  Hastie for your service on this jury.

16          I don't know if y'all realize what an important

17  function that y'all are serving, that y'all are undertaking.  I

18  don't know if you understand how important the jury system is

19  to our freedoms in this country.

20          You really -- the system that we are going through

21  really separates us from the Irans and Koreas of this world

22  because in the United States of America, no matter how powerful

23  the federal government is, nobody can be convicted of a felony

24  unless 12 people, all 12 people, of peers, a jury of her peers,

25  decides beyond a reasonable doubt that she is guilty.

1    Our other freedoms wouldn't mean anything -- freedom

2    of assembly or freedom of speech -- if the Government was

3    allowed to scoop you up and put you in jail.  This system that

4    we are going through really separates us from those

5    dictatorships, and it's a foundation for our democracy.  And I

6    sincerely appreciate your service.

7    I am extremely proud to have spent 40 years doing

8    this, participating in this constitutional process we are going

9    through.  And I know you've, undoubtedly, heard bad things

10   about criminal defense attorneys, but I am proud to be a

11   criminal defense attorney and I am especially proud to

12   represent that lady over there, Kimberly Hastie.

13   False, false, false.  Chad Tucker is going to get on

14   this witness stand, and he's going to testify that the invoices

15   were false.  Do you remember that?  One of the first things the

16   prosecutor said.

17   And what did Chad Tucker testify to?  He testified

18   that everything in his invoice was earned; that there was

19   nothing false in those invoices; that they fairly represented

20   the work he did; and that there was a proper wage for proper

21   work.  False, false, false.

22   Yes, there's something false about this, and what's

23   false is the Government's case -- welcome to the case of the

24   federal government attempting to impose its unique

25   interpretation on a Mobile County contract.

```
 1              Welcome to the case where the federal government is

 2    attempting to turn what they say is a billing error or an

 3    accounting mistake into an obtaining-property-by-fraud case.

 4              And welcome to the case of the federal government

 5    siding with and protecting a man who has been bilking the local

 6    government for 25 years and siding against one of the best and

 7    most effective and efficient public servants that this county

 8    has ever seen and who is attempting, after doing an amazing job

 9    in the License Commission, attempting to save the Mobile County

10    citizens $1 million a year by wanting the people of Mobile to

11    vote on the combination of the offices that has worked so

12    effectively in almost every county in the state.

13              This Government case is full of smoke and mirrors and

14    rabbit trails.  Let's look at what she is charged with in the

15    indictment, and then let's look at what the Government has

16    proved.

17              Kimberly Hastie is charged with intending to deceive

18    or cheat somebody out of money or property.  She's accused of

19    stealing.  And she's specifically accused of stealing the

20    $10,500 that went to Mobi-Media.  And she is specifically

21    accused of stealing the $10,000 that went to Strateco.  And

22    she's specifically charged with stealing the $10,000 that was

23    given to John Gray.  That's what fraud is.  Stealing.  And I

24    think you'll agree that the evidence was that she didn't steal

25    anything.
```

1          Now, the prosecutor said I was going to talk about

2     the contract, and I sure am.  This contract says that, "The

3     Contractor shall provide additional personnel from time to

4     time, as needed and requested by the License Commissioner.  The

5     Contractor's personnel shall perform the work and tasks

6     assigned by the License Commissioner."

7          There is no limit in here as to the nature of the

8     tasks that she can ask to be performed.  During this contract,

9     she can ask for anything.  There is no -- nothing in here that

10    says that the persons, the personnel that are tasked, have to

11    collaborate with Victor Crawford.  There's nothing in there

12    that says that.  That is a smoke and mirrors.  That's a rabbit

13    trail.  There's nothing in here that says that.

14         Now, she billed legitimate services, pursuant to this

15    contract, through Victor Crawford.  Mobi-Media and Strateco

16    provided services through this contract and were billed through

17    APL.  There's no problem with that.  There's no collaboration

18    needed to do that.  There's no limited type of services in

19    that.

20         So except for -- so the federal government, the

21    federal prosecutors, say interpret this contract as not

22    allowing that billing.  That's their interpretation of the

23    contract.  So who else interprets that contract the way the

24    federal prosecutors do?  Certainly not Michelle Herman.

25    Certainly not the finance director.  She said that Kim had

1   broad discretion over what could be -- what could be charged

2   under this contract, and it was up to her to determine what was

3   proper under this contract.

4          She billed the time under her computer consultants.

5   She was under budget.  And Michelle Herman, the finance

6   director, said she had broad discretion as to what to charge.

7          Now, what other County official said that she could

8   not bill under this contract for what she billed Strateco and

9   Mobi-Media?  Well, the indictment says that the County

10  Commission was tricked by this billing.

11         They were a party -- the County Commission is a party

12  to this contract.  There's three County Commissioners.  Did

13  Connie Hudson, County Commissioner Connie Hudson, come down

14  here and tell you that she could not bill under this contract?

15  No.  And I guarantee you if she was -- if she had that opinion,

16  she would have been on that witness stand.

17         Did Jerry Carl, who did come down here testify, tell

18  you that it would be improper for billing under that contract

19  for Strateco and Mobi-Media?  No.  I guarantee you if he had

20  held that opinion, he would have been on the witness stand, and

21  he would have testified to that.

22         Merceria Ludgood, Commissioner Ludgood, did she

23  testify or say anything that Strateco and the Mobi-Media bills

24  were improper, improperly billed, under this contract?

25  Absolutely not.  And I guarantee you if she held that opinion,

1    she'd have been here.

2         Did anybody else -- John Pafenbach, the

3    Administrator; the County attorney -- did they come down here

4    and tell you that under this contract Strateco and Strateco

5    [sic]  Should not have been billed?  No.  No County official

6    testified to that.  The only person that holds -- the only

7    people that hold that theory that they can't be billed under

8    here is the federal government, their prosecutors.

9         And did you hear anyone from the County say that the

10   services rendered were illegal or improper?  Did you hear

11   anybody in the whole case say that, we are not properly billed?

12   It was not proper for a government to bill -- no.  It was --

13   nobody said that.

14        You've got brochures, newsletters.  You heard the

15   testimony of the County -- of the Baldwin County Education

16   Board billing 200-something thousand dollars to get their

17   referendum passed.  Nobody said that the services provided by

18   Strateco or by Mobi-Media were improper.  Nobody.  There was no

19   evidence whatsoever.

20        You didn't hear any County Commissioner come in here

21   and say that those services were improper for a County official

22   to contract under.  You heard no County attorney.  You heard no

23   County official say that there was anything improper,

24   inappropriate, or illegal about the services rendered to Kim

25   Hastie by Strateco or Mobi-Media.  And I guarantee you if the

1   County Commissioners held that opinion, they'd have been up

2   there, and they would have told you.  These are the people that

3   were supposedly tricked.  These are the people that contracted

4   with Victor.

5         So it is only the Government who has this unique

6   theory and this unique interpretation of this contract that,

7   for some reason, there has to be some collaboration or that it

8   was improper to bill through there.

9         So, in 2002 [sic], Kim contracted with Mobi-Media to

10   do some public relations work.  The prosecutor said it was

11   political work.  The indictment said it was political work.

12   There is no evidence whatsoever that it was political work.

13   Everybody testified that it was not political work.  It was

14   public relations work.  It was properly billed.  It was

15   properly done.  They performed legitimate work.  They were paid

16   fairly.  Uncontroverted.  Nobody said that they weren't.

17   Suddenly, there's some sort of fraud going on because it was

18   billed under this contract.

19         In 2012, Victor Crawford had no problem whatsoever

20   paying the $10,500 Mobi-Media bill.  He testified to that.  He

21   was fine with it.  He sent them a 1099 afterwards.  He had no

22   problem with it in 2012.

23         In 2013 and '14, interestingly, a company named

24   Wakefly was retained through this contract.  Now, Wakefly did

25   not -- was not an employee of Victor Crawford.  They were a

1   contractor.  They were a firm, and they were properly billed

2   under this contract.  They weren't employees of Mr. Crawford.

3   He wasn't paying anything.

4          And, in 2014, Kim decides to obtain the services of

5   Strateco, and she tells Victor Crawford that, "Like in 2012,

6   Victor, I'm going to bill them through your contract."

7          And Victor Crawford claims he got the invoice, had no

8   idea what it was, sat on it for a while, never asked Ms. Hastie

9   about it, didn't do anything, and then he didn't know what the

10  contract was for, he didn't know who the company was, he didn't

11  know why he was being billed, but he goes and pays the bill.

12  Now, is that the craziest thing you've ever heard?

13         But we know that's not the truth.  And you know why

14  we know that's not the truth because, luckily, during one of

15  his taped conversations, he admits it when Kim says "I told you

16  about that."

17         Can we play a video?

18      [Video played in open court, transcribed to the best of

19       the reporter's ability and not part of the certified

20       verbatim record.]

21      MS. HASTIE:  I don't know why you didn't put it on

22  there.  Why did you not?

23      MR. CRAWFORD:  We hadn't spoken about it.  When it

24  first showed up, I kind of assumed --

25      MS. HASTIE:  Well, I told you that day I talked to

1   you -- yeah, we talked about it.  I came into your office --

2           MR. CRAWFORD:  I don't remember that.

3           MS. HASTIE:  And I said, look, you remember how you

4   paid for Chad before.  I said I'm going to do that again.  So

5   I'm going to start running that through yours.  We talked about

6   it.  You said okay.

7           MR. CRAWFORD:  Oh, okay.

8           MS. HASTIE:  [Inaudible] and I came into your office.

9       [End of video.]

10           MR. N. HANLEY:  "I told you about it."  When Victor

11   tries to say I didn't know anything about it, "I told you about

12   it.  I came by your office."

13           "Oh, okay."

14           "I came by your office, and we talked about it.

15   Okay.  I would never do that if I hadn't asked you about it."

16   So, now, we know that Victor's story about not knowing what

17   this invoice was about is just a lie.  It's on tape.

18           We knew it was an incredible story, anyway, that he

19   was going to take a bill that he didn't know what it was for,

20   that he didn't know who the company was for and pay it.  That

21   was a crazy story.  But, now, we have proof that he was lying

22   about it.

23           So then he gets another bill.  And he gets so upset.

24   He gets so upset about another $2500 bill that he goes to law

25   enforcement.  He gets up there on the witness stand and he

1  sheds those crocodile tears and invokes the name of his

2  beautiful daughter.

3        Now, the man's caught -- the man is caught in 2007

4  overbilling the County government $82,000.  And then he tells

5  you all, "I didn't really overbill them," but he paid it back.

6  In 2007, he's overbilling $82,000.  Two years before, he had

7  gladly paid a bill for $10,500 from Strateco -- I mean, for

8  Mobi-Media.  And, now, he tells you that he thinks that a crime

9  has been committed because he gets another $2,500 bill.  It's

10  absurd.  So he goes to the government, goes to the F.B.I.  This

11  was a guy who charges the Government $75 an hour and pays his

12  employee $35 an hour -- 35.

13        MR. S. HANLEY:  25.

14        MR. N. HANLEY:  $25 an hour and pockets the rest of

15  it for doing nothing.  You remember, it's Katie Williamson.

16  She got on.  And do you remember him saying, "I paid Katie

17  Williamson's health insurance."  Just a lie.  Katie got on

18  there and told you.  "I supervised Katie."  A lie.  She said

19  she was on her own most of the time.  She was training people.

20  "I trained Katie."  Another lie.  Basically learning on her own

21  and if she had a question, she had it.

22        Now, in this period from January of 2012 through May

23  of 2014, the bilk, he made $194,908 just on overbilling Katie

24  Williamson.  Now, I understand that when a plumber comes to my

25  house and charges me $100 an hour, I know the two guys there

1  aren't being paid $100 an hour.  But I know the plumber has got

2  overhead.  He's got an office.  He's a van, vehicles, overhead.

3  Victor Crawford told you he had no overhead and that it was

4  basically going into his pocket.  Health insurance, he

5  testified under oath.

6        So he goes in and he gets wired up.  For four months,

7  he is wired and taping Kim.  And he could have said anything he

8  wanted to.  He controlled the entire conversation.  He could

9  have easily said, "Kim, I don't think it's proper for this

10 billing to occur through my company."  But he doesn't, and he

11 doesn't because he knows the answer.  He knows what the answer

12 is going to be.  "Well, okay, Victor, if that's the way you

13 feel about it."

14        But he specifically does things, and there is no one,

15 anything, on those tapes that Victor Crawford was ever

16 threatened, ever.  And they are making something horrible --

17 once again, smoke and mirrors -- out of Kim asking, "Please

18 make the invoices more descriptive, please provide more

19 information.  I've got to have this for the auditors.  Please

20 tell me exactly what you are doing."  And somehow that's fraud?

21        Somehow providing more information is fraud,

22 according to the Government?  Those aren't Kim's words.  Those

23 are the words of the people that are doing the work.  More

24 smoke and mirrors.  You make an invoice more descriptive and

25 more true -- it's fraud; you are trying to hide something.

1    Now, in 2014, she hires John Gray, and she hires him

2    to pass a bill to get the offices combined.  She asked him to

3    help get through the legislature a bill that would allow the

4    people of Mobile County to vote on the combination of the

5    offices.

6    This mad desire that she has to be the revenue czar

7    of the combined offices is bunk.  She could have -- she could

8    have got a local bill passed that wouldn't require the votes of

9    the people.  The first draft out of the legislature was a local

10   vote that didn't require the vote of the people.  She rejected

11   it.  She said, "I insist the people vote on it.  If they don't

12   want it, I don't want it."

13   She's just as passionate as she was about 10-minute

14   tags and that she could do it and nobody thought she could do

15   it.  She was just as passionate after she got that office under

16   control that she would like to save the Mobile County citizens

17   money.

18   And she got the support of legislature to do so.  She

19   really felt that she could save the taxpayers of Mobile County

20   $1 million a year with no personal gain on her part.  And no

21   personal gain on her part.  You remember all the legislators

22   and John Gray said she never talked about salary.  She never

23   had any input about salary.  John Gray flew a figure, the

24   legislators called around, and they came up with the salary.

25   She had no input on that.

```
1              Gray told her she could get it done by a local bill.

2   She didn't want it.  There is no allegation whatsoever that

3   Gray's work was improper or not legitimate or not properly

4   billed to a local government.  Once again, Baldwin County is

5   paying $225,000 in lobbying expenses, media expenses to get

6   a -- their initiative passed, and the Attorney General

7   explicitly said it was okay.

8              So nobody says that that is wrong.  What they say is

9   she paid under an account that she shouldn't have paid, and, as

10  John Gray said, she told him, I can pay it under this account.

11  She thought she could pay it under that account.

12             No one was defrauded.  There were no false

13  representations made to anybody.  The County Commission had

14  nothing to do with that account.  It was a separate account in

15  the License Commission and properly passed by the legislature.

16             The testimony was that she would have been audited

17  every two years.  Every account is audited in the License

18  Commission Office.  And the Government says she stole this

19  money.  That's the allegation under their fraud allegation,

20  that she stole it.  That's what the judge is going to charge

21  you, okay, is this fraud dispute.

22             And, John Gray, when it was discovered that she

23  shouldn't have paid it under that account, he then paid her,

24  paid it back.  But even if he hadn't paid it back, she had done

25  nothing wrong criminally.  There was no fraud there.  It was a
```

1    legitimate purpose.  And John paid it back because he didn't

2    want the blood money, and he describes the blood money as he

3    knew that Kim thought she had the authority.  He knew that Kim

4    made a mistake, and he wasn't going to have that on his

5    conscience that something bad could happen to Kim because she

6    paid him out of the wrong account.

7              Counts 10 to 15 charge Kim with extorting Victor

8    Crawford and that Victor Crawford -- that she threatened and

9    intimidated him.  What evidence of threats and intimidation do

10   you have in Mr. Crawford's testimony?  He says that Kim fired

11   or disciplined other people and that he was afraid that if he

12   didn't give the donations that he would be fired.

13             Now, what evidence is there that there was an

14   explicit promise by Kim -- because that's what the judge is

15   going to charge you in this case -- an explicit promise to fire

16   or not to fire -- none -- if he didn't do what she wanted him

17   to do.

18             "Has Ms. Hastie ever intimated or ever told you that

19   she might fire you?"

20             "Yes."

21             In what manner -- and here is the only one.  This is

22   it.  There was a County attorney, Jay Ross, had introduced her

23   to the competition, what I call the competition, which was the

24   firm in Montgomery that had Montgomery County that works the

25   computer system for Montgomery County.  And she would say, "You

1    know how they want me to get rid of you and get them, but I

2    tell them -- I tell them, you know, you are loyal to me and you

3    are competent and I won't do anything, even though I like the

4    guy, Daniel, but I'm not going to do anything."

5            That was the so-called explicit threat.  In other

6    words, saying they want me to hire somebody, but I'm not going

7    to do it, Victor.  You are competent, and you are loyal.  And

8    then the whole thing is about him getting fired.  He was afraid

9    he was going to get fired.

10           Do you remember the tape -- and I hope to play it to

11   you in just a minute -- of Kim saying, "Don't leave me, Victor.

12   Don't leave me stranded."  That she depended on him, that she

13   was afraid he was going to leave.  You've seen the -- or you

14   will see the letter to Jefferson County or Jefferson County

15   Department of Motor Vehicles up there where she -- she lavished

16   praise on him.

17           You will see in the tape that we are going to play or

18   that you'll have it back there, that at the end of the tape,

19   she said, Victor -- first of all, she praised him during it.

20   She told him, "I know that you do it best.  I know you are the

21   best there is."  She said, "Victor, if you complete this

22   program, you could go out and sell it to a couple counties.

23   Don't you want that?  And then you go to sell out to maybe some

24   bigger counties."  All encouragement.  And remember the tone of

25   her conversation with Victor?

```
 1                And this atmosphere of intimidation at the office.
 2   You remember those employees that walked in here and got on
 3   that witness stand and who were brimming with pride over what
 4   they had accomplished and were so happy, so happy that they got
 5   to provide Mobile this great customer service of 10-minute tags
 6   from what it was?  The words were just -- they were just so
 7   happy and so proud to be able to work in an office that
 8   provided such a service.
 9                Did you see any atmosphere of intimidation there?
10   They were thrilled with the changes.  They were thrilled with
11   the atmosphere.  They were thrilled with their work stations,
12   thrilled at turning one-, two-, three-hour tags into 10-minute
13   tags.  And, of course, Victor Crawford said that she was very
14   good to him.
15                And Count 15 is the epitome.  This count is it.  This
16   count is representative of the Government's case.  Victor
17   Crawford starts cooperating with the Government in April of
18   2014.  We find out in July of 2014 that he's been cooperating
19   the entire time.  In July of 2014, the federal government
20   brings up that he has made a campaign contribution.  He didn't
21   bring it up.  He didn't complain about it.  The federal
22   government brings it up, "Did you make the campaign
23   contribution?"
24                "Oh, yeah, I did."
25                All of a sudden, it's coercion.  He didn't bring it
```

1  up.  He didn't complain about it.  But the next thing you know,

2  here it is, extortion.  And when he says that Joe Ruffer asked

3  him to make the contribution, there's no evidence of threat

4  whatsoever.  No evidence of a promise whatsoever.

5         Now, I'm going to hurry.  Now, this false statement

6  is interesting.  Victor -- Kim tells Victor, you've got to pay

7  that money back because of your computer glitch.  Victor goes

8  into Ramona's office and -- because Victor says Ramona was

9  there when she said he could pad his bill to make up for the

10  18,200.

11         He tapes her.  He doesn't say -- and he wants to make

12  sure that Ramona knows, heard what he said -- what she said.

13  He doesn't say, "Ramona, did you hear what she said about me

14  padding my bill?"  He says, "Ramona, she told me I could pad a

15  bill."

16         Obviously, Ramona had not been present at that

17  conversation.  And Ms. Hastie, Kimberly's office, is right next

18  door, and he could have easily gone to Kimberly Hastie's office

19  and said, "I'm padding my bill this month or you said I could

20  pad my bill."  Boom.  There's the case.  But not -- he's not

21  going to do it.  He's not going to do it because he knows if he

22  went in there and said Kim or, "Ms. Hastie, I'm going to pad my

23  bill," she's going to say, "What are you talking about?  You're

24  not padding anything."

25         And, goodness gracious, he's been padding his bill

1    for 28 years, and he's all of a sudden so upset that Ms. Hastie

2    said she could pad -- he could pad his bill.  Absurd.  I mean,

3    absurd.  And had the perfect -- you want to provide proof.  He

4    had it to go.

5             Count 17, which the prosecutor says "done," I guess

6    we don't need you.  "Done."  I'd like to show you what's been

7    marked into evidence as Government's Exhibit 2.  This is the

8    policies, and it's got the Driver's Privacy Protection Act.

9    And the last sentence in there is personal information is

10   defined as, quote, information that identifies a person,

11   including a person's Social Security number, name, and address.

12   There is nothing in there that says anything about E-mail

13   addresses.  And that's what she thought was the personal

14   information because that's what she put in the brochure.

15            If you want to know what somebody is like, if you

16   want to -- if you want to really know what somebody's attitudes

17   are, if you want to really know how somebody is treating

18   somebody, go tape them when they don't know they are being

19   taped.

20       [Recording played in open court.  Reported to the best of

21       the Court Reporter's ability and not included as part of

22       the verbatim record.]

23       MS. HASTIE:  About the boat program, it was scheduled

24   for tomorrow, but you're going to be out.  Katie's going to be

25   out.  And so we've moved it to the next [inaudible].  I don't

1511

1   know when she put it on schedule, but she's moved it to the

2   next day.  You know that Brandy is pushing to go to the State

3   system.

4           What's her name?  Katie told me that you are

5   80 percent finished with the boat program because you wrote

6   almost all of it whenever you were going to show Jefferson

7   County.

8           MR. CRAWFORD:  Uh-huh.

9           MS. HASTIE:  But it only had 20 percent.  But

10  20 percent does me no good if it's never finished.  So you need

11  to come to that meeting prepared when we meet next week to tell

12  me what you are going to do about that.  Because -- okay.  I

13  guess where I'm coming from, it comes back to the same thing.

14  There's no way, with all these demands that we need, that you,

15  as one person, especially now that we've gotten sales tax.  You

16  know, once sales tax goes to the County Commission, I mean, I

17  personally think if you play your cards right, they will keep

18  you.  I really do.

19          But -- so that means that it's never going to get any

20  easier.  You are still going to have sales tax and they're

21  going to come and change stuff [inaudible] tags and you are

22  still going to have tags.  You are one person.  I get very

23  frustrated because, yes, I know you are one person, but I still

24  need this stuff done.  So where are we on hiring this person

25  that you are actually going to get to do work?

```
1           MR. CRAWFORD:  The first two did not -- petered out.

2   I got another one, another prospect right now.  I meet with her

3   when I get back.

4           MS. HASTIE:  Okay.  I mean, you understand where I'm

5   coming from?  It's not going to let up.  I mean, you've got to

6   listen.  I mean, if you worked 14 hours a day, 15 hours a day

7   every day, you still couldn't catch up in the time that we

8   would like it.  You are one person.

9           MR. CRAWFORD:  Uh-huh.

10          MS. HASTIE:  So, you know, now it's gotten to where

11  people never noticed you or anything, but, now, because

12  everybody is wanting you and everybody is pulling on you, now

13  "Victor is never here.  I can't find Victor."  You know, I can

14  say [inaudible] in front of Ramona.  Are you working on

15  something outside this office?

16          MR. CRAWFORD:  No.

17          MS. HASTIE:  Are you really not?

18          MR. CRAWFORD:  I'm really not.

19      [Cross talk.]

20          MS. HASTIE:  Well, I don't have a clue.

21          MR. CRAWFORD:  Another job?

22          MS. HASTIE:  I know how you are, and I know you

23  already have that mind of yours going about, okay, what if we

24  don't get the offices together, and what if somebody comes in

25  here.  I know your what if's, which you should.  But have you
```

1    done something already?

2              MR. CRAWFORD:  No, ma'am.

3              MS. HASTIE:  You really haven't?

4              MR. CRAWFORD:  No.

5              MS. HASTIE:  Okay.  Victor, I'm going to say this out

6    loud in front of Ramona.  You know, I trust you.  And I think I

7    have a proven my loyalty to you.  If you did something that you

8    are going to leave me stranded, I am going to come and hunt you

9    down and I'm going to find you.  Okay?  You hear me, right?

10             MR. CRAWFORD:  Yes.

11             MS. HASTIE:  I am all about somebody doing something

12   they need to do for their family and livelihood.  Don't you

13   leave me hanging because I didn't do that to you.

14             MR. CRAWFORD:  No, I have no other job.  I'm not

15   working anywhere else.

16             MS. HASTIE:  You are not here like you used to be.

17   It appears that to everybody.

18             Don't you hear that all the time?  It's getting to

19   me, and I know it gets to her more than me.

20             MR. CRAWFORD:  All I did is shift from 6:30 in the

21   morning to 4:00, 3:30 or 4:00.

22             MS. HASTIE:  But that's not the way it appears.  So

23   I'm just telling you that's the perception.  And people are

24   trying to find you and all that kind of stuff.  And I don't

25   care what hours you work as long as you get the work done and

```
1    as long as you are available if something goes wrong.

2           But that is the perception that everybody has gotten.

3    So I've been hearing it a whole lot.  I just want to make sure

4    that you and I are on the same page because I truly do -- I

5    feel probably 80 percent confident that the offices will be put

6    together.  Okay.  There's that 20 percent that it could fall

7    through and then if it does, even then you are going to have

8    six or eight months after that which you are going to know that

9    it's not going to go together and then you'll make the decision

10   if you are going to go back and, you know, all that kind of

11   stuff, you know.  But --

12          MR. CRAWFORD:  Well, no, I understand what you are

13   asking me, am I working somewhere else or doing something else

14   because the perception's that I'm not here.  But I'm here,

15   like, early in the morning until 3:30, 4:00 o'clock.  And then

16   I'm --

17          MS. HASTIE:  Okay.  Well, some days you leave for

18   lunch, and you leave at 11:00 or 12:00, or whatever time you

19   leave, and then you'll come back at 1:00 or 1:30, or whatever,

20   and you may leave again at 3:30.  So the perception is that you

21   are not here because maybe they are not seeing you early.  I

22   don't know.  And when they come --

23          MR. CRAWFORD:  Mike sees me.

24          MS. HASTIE:  So I just want you to be aware.

25          MR. CRAWFORD:  Michael and Angela has seen me.
```

1   [Inaudible]  Angel.  Mike and Angel see me first thing in the

2   morning.

3       [Cross talk.]

4           MR. CRAWFORD:  They see me between 6:15 and 6:30 in

5   the morning.

6           MS. HASTIE:  Okay.  Well, I mean Ramona is here.  So

7   Ramona knows if you are here or not.  But the thing is that I

8   need you to get this stuff done.  So, you know, One Spot

9   needs -- I mean, you need to get to the point where it's not

10  90 percent of your time anymore.  You need to get it where it's

11  30 percent of your time.  Then you need to get back on tags and

12  get that stack that Katie's got waiting on you and you can't

13  get to -- done.  I need you to get in records.  I need to get

14  boats.  I need to get in mobile homes.

15          MR. CRAWFORD:  Boats?  I fixed everything in boats.

16          MS. YEAGER:  Ms. Hastie, part of it is Brandy.

17  She -- I mean, Victor fixed the history, the blue numbers, and

18  then she found another problem, which didn't even relate to

19  that.  So every time she found something, it's like Victor

20  still hasn't fixed -- you know, fixed it.  But this doesn't

21  relate to this.  This was a clerk error over here.  In his

22  defense, that's what happened yesterday.

23          MS. HASTIE:  Okay.  And I understand that.  But the

24  big picture, though, is that we've been talking about this new

25  boat program since I've been here five years.  So then I know

```
 1    that you worked on it really hard and you got -- Katie says

 2    80 percent.  I don't know what percentage you are finished.

 3            You go to Jefferson County and present it, but we

 4    still don't have it.  So her point is because I told her two

 5    years ago that, you know -- and this is the thing.  I know

 6    Brady is overzealous, and I think that Brandy is being too

 7    hard-nosed and we are going to have to back her up.

 8            And that is the reason I'm having the meeting.  Even

 9    today I think I proved my point by what I was talking about.

10    You know, Brandy.  I didn't say "Brandy."  I didn't want to

11    embarrass her.  Of course, I knew it was Brandy that talked to

12    this guy.

13            My thing is Brandy can't tell this person no and then

14    they go to Baldwin County and they can get it.  So we have got

15    to decide -- but that's policies.  But in her defense, I'm glad

16    she's not one of these lazy-ass county workers that have no

17    initiative and don't give a rat's ass about it.  At least she

18    has a concern and she's trying to fix it.  So I've got to take

19    that person and this person and mold them together.

20            So I've got to keep them from being too hard, but not

21    dampening her spirits to where she's going to sit down on the

22    job, like everyone else does.

23            So in her defense, for two years we've been telling

24    her we're going to get this boat program finished.  So in her

25    mind, why don't you just go to the state for two years until
```

1    Victor got around to it and went back.  Well, you know, quite

2    frankly, why didn't we.  You see what I'm saying?

3            MR. CRAWFORD:  It couldn't do our sales tax.

4            MS. YEAGER:  We did try [inaudible] was here.

5        [Cross talk.]

6            MS. HASTIE:  -- is better.  And she's done her

7    homework on it.  Again, I'm thrilled that she's cared enough to

8    call and find out about it.  We don't have anybody else here

9    that does that.  Well, not anybody.  But you know what I'm

10   saying?  The majority, you know.  So I don't want to dampen her

11   spirits.

12           However, we've just got to calm her down and either

13   we've got to go to the state system or you need to finish this

14   one.  I'll say it again.  You've got to finish One Spot sales

15   tax stuff.  You've got to get into the records.  You've got to

16   do the boats.  All these "got to's."  You're one person.  And

17   we're having the same conversation.  And we've had it six

18   months ago.

19           MS. YEAGER:  And I really think [inaudible] bigger

20   than what people realize, and it just -- it's created a lot of

21   [inaudible], too.

22           MS. HASTIE:  Okay.

23           MR. CRAWFORD:  I'm not finished with that.  And I've

24   made it real easy for her.  I made it real easy, and complies

25   with the auditor.  The auditor comes here two years from now,

1    and they want to see it.  They are going to see that exact

2    refund, not what she was doing.

3            You know, she was refunding the entire record and

4    putting out 17 -- 17 percent one.  And you just supposed to do

5    the math and figure up --

6        [Cross talk.]

7            MR. CRAWFORD:  -- the money that actually went out.

8    And the auditors are not interested in the 17 percent or the

9    original [inaudible] money went out the door.

10           MS. YEAGER:  Well, we're going to do it by the way

11   the Department of Revenue is telling us.

12           MR. CRAWFORD:  Uh-huh.

13           MS. HASTIE:  Well, and that's what I'm saying.  We

14   needed to have this meeting with her and let her tell me what

15   she's going to tell me and you tell me what you're going to

16   tell me and we'll make a decision and move forward.  But you

17   see what I'm saying?  This is not going away.

18           It's -- I know that in your mind -- because I know

19   how you are -- you think I'm going to get finished with that

20   and then I move onto something else.  I'm going to get finished

21   with that.

22           Well, your intentions are good, but I don't think --

23   this is not an animal being the License Commission -- it's not

24   an animal that you are ever going to totally put to rest.  You

25   are always going to have it biting on your leg.  You know what

1    I mean?  You just can't do it by yourself.

2            MR. CRAWFORD:  I'll see her Friday.  I'll introduce

3    you to her Friday when she comes in.

4            MS. HASTIE:  You understand what I'm saying; right?

5            MR. CRAWFORD:  Yes.

6            MS. HASTIE:  Victor, it takes me [inaudible] did a

7    good job.  But, hell, you wouldn't let them do your stuff.  You

8    can't hire somebody that you are not going to let you help you.

9    If you are going to hire somebody, you've got to let them help

10   you.  You got that; right?

11           MR. CRAWFORD:  Yes, ma'am.

12           MS. HASTIE:  I mean, I know nobody can do this as

13   good as you.  I get it.  But you still -- it would be like me

14   saying I've got to do everything here by myself, like Carol

15   did, and you saw.  It all went to shit.

16           So she does tons of stuff without me.  Lots of people

17   do tons of stuff.  I know what's going on, but I can't

18   literally do everything in this office.  It's too big.  That

19   goes for you.  I'm tired of having this conversation, though.

20   So, I mean, you've got to help me.  You've got to tell me

21   because -- you see what I'm telling you; right?

22           MR. CRAWFORD:  Yes, yes.

23           MS. HASTIE:  One Spot, you seem to realize --

24           MR. CRAWFORD:  Things keep coming.  Like you said,

25   it's never going to let me go.  I got this coming up and this

```
 1    coming up.

 2         [Cross talk.]

 3            MS. HASTIE:  And I realize I keep thinking, well,

 4    they are not all going to be as big as what we've done, but I

 5    think they are.

 6            MR. CRAWFORD:  But they keep showing up as big.

 7            MS. HASTIE:  I think they are.  And that's exactly

 8    right.

 9            You know -- and with this office being so big and

10    this county being so large, even your system that you -- even

11    when you get records done and mobile homes and boats done and

12    even when we consider it because right now we don't consider it

13    a complete program.  You don't even consider it a complete

14    program.  So even when we get to the point where we consider it

15    a complete program, we've got to go with the times.

16            So you're always to be reinventing, redoing.  So

17    you're always going to have a big project.  You know that's

18    just the tag side.  That's not the sales tax that you're

19    working on.  And then you know my personality, Victor.  So

20    let's fast forward 18 months, and let's say -- let's say that I

21    can talk them in, which I hope I can, of moving the sales tax

22    down the other end out here.  You know, I'm going to talk to

23    them in because I'm sure they are going to put Glen Hodges over

24    them.

25            MR. CRAWFORD:  Oh.
```

```
 1          MS. HASTIE:  And Glen Hodges is not coming in my

 2   building because I can't stand him.  So I'm pretty sure he's

 3   going to be the boss.  So I'm going to see if I can talk them

 4   into letting them move down to David's [inaudible] or if they

 5   close that thing at the end because then you will still be

 6   right here doing their computer program.

 7          But let's say that they move them down to the County,

 8   to the courthouse -- okay?  So that means you've got to be

 9   available for them again.  So that means you're going have some

10   time that you're going to be pulled down to the courthouse.

11   Kim does not do well with that.

12          MR. CRAWFORD:  I'll have my assistant check --

13      [Cross talk.]

14          MS. HASTIE:  I'm thinking out loud.  You hear me

15   telling you out loud.  Because I don't do well with sharing.

16   Okay?  Not sharing the person.  Sharing the play box.  You

17   know, I don't do well with that.  So I'm the priority.

18          So let's just say hypothetically that the sales tax

19   moves down there and they keep your system -- okay?  And, see,

20   I'm even trying to help you, believe it or not, by trying to

21   get them to move down here because, again, out of sight out of

22   mind.  It's working well.  It's out here.  You [inaudible] the

23   courthouse.  Everybody is happy.  I'm happy.  They are happy.

24   You're happy.

25          They move down to the courthouse, you have got to go
```

1    down there some.  I need you down here.  That's not a good --

2    that's not good.  So I'm trying to help you.  I'm trying to get

3    them to move down there.  But you need to be thinking about

4    that because if they go down there, you need have somebody that

5    knows sales tax and can go through you, too.

6            MR. CRAWFORD:  I'll introduce you to her if she comes

7    in Friday.

8            MS. HASTIE:  You're following me, though; right?  You

9    understand what I'm talking about loud and clear?

10           MR. CRAWFORD:  I can't do it all by myself.  I need

11   to get somebody else.

12           MS. HASTIE:  I think you've proven it.  Don't you

13   think?

14           MR. CRAWFORD:  Yeah.  Yes.  We will grow through it.

15           MS. HASTIE:  You have too much.  And this mobile home

16   thing is old and the boat system is, too, and it's something

17   you've been working on forever.  I mean, don't you want to be

18   finished?

19           MR. CRAWFORD:  Oh, yes.  I definitely do.  Bring that

20   second module in and let it flow in through the cash-out system

21   and then the third one, which would be manufactured homes.

22           MS. HASTIE:  Because if you really do get the whole

23   thing -- no, huh-uh.  Let me take that back.  When you do.  Not

24   ever.  When you do get it finished and it's a whole program,

25   it's the county department, it's boats and mobile homes and

1    it's the tags, when you truly have it done, then, Victor, you

2    will be proud of yourself to go out and pick up a couple of

3    small counties and see how you do and then start adding a

4    couple of employees and then go out and get a bunch of

5    counties.  You totally could do that.  But you can't do that

6    until you finish it.  Don't you want to do that?

7              MR. CRAWFORD:  Yes.

8         [End of recording.]

9              MR. N. HANLEY:  That's Kim Hastie, unrehearsed, being

10   encouraging, being thankful, encouraging him to expand his

11   business, complimenting him, giving him encouragement

12   unrehearsed.  That was the real relationship you saw between

13   Victor and Kim, and that's the way it was.

14              She encouraged him.  She tried to help him in his

15   business.  She tried to help him expand -- that glowing letter

16   of recommendation.  She wrote to Mobile -- I mean, to Jefferson

17   County about how wonderful he was, and Victor even admits that

18   "She was good to me."  There was no extortion in this case,

19   ladies and gentlemen.

20              The atmosphere of intimidation.  No.  It was actually

21   an atmosphere of accountability.  That's how she got these

22   10-minute tags.  That's why these employees were so happy,

23   proud of themselves, proud of the service that they render to

24   people because she came in with an atmosphere of

25   accountability, not an atmosphere of intimidation.

1    Now, I want to go back to something because I forgot

2    about it, the $1.25 fund.  No matter what she told <u>Lagniappe</u>

3    when the F.B.I. came a calling, when the F.B.I. came to her

4    office, she told them that she had paid Gray and that she told

5    them that she had paid them out of the account, out of the

6    $1.25 account.  That was the testimony of Agent Kelley.

7    She told him about Strateco.  She told them about

8    Mobi-Media.  She didn't hold anything back to this federal law

9    enforcement officer.

10   And I said that our jury system is the foundation.

11   It's our foundation of our democracy and one of our freedoms.

12   There is a legal tenet.  There is a law that is the foundation

13   for jury -- for your criminal justice system.  Tenet.  And,

14   that is, before a defendant can be found guilty, they must be

15   proven beyond a reasonable doubt.  There must be proof beyond a

16   reasonable doubt.

17   And the judge is going to instruct you that proof

18   beyond a reasonable doubt is proof so convincing, so convincing

19   that you would be willing to rely and act on it, rely and act

20   on it without hesitation, in the most important of your

21   affairs.  If you are convinced the defendant has been proven

22   guilty beyond a reasonable doubt, say so.  If you are not

23   convinced, say so.

24   It's so convincing that you'd be willing to rely and

25   act on it without hesitation in your most important affairs.

```
1    The care of your children.  Your financial affairs.  Your

2    family affairs.  And the question is, would you be willing to

3    rely on the word of Victor Crawford in matters concerning your

4    family?  Would you be willing to rely on Victor Crawford in

5    matters concerning buying a house?  Would you buy -- would you

6    believe his representations if you had some sort of financial

7    dealings with him?  Would you be willing to rely and act on his

8    words without hesitation?  I'll submit to you definitely no.

9            There is a saying among law enforcement and judicial

10   officers and lawyers and law enforcement that you are upholding

11   law enforcement as much when you vote to acquit when there's a

12   reasonable doubt as when you vote to convict when there is no

13   such reasonable doubt.  You are supporting law enforcement just

14   as much when you vote to acquit when there's a reasonable doubt

15   as you do when you vote to convict when there is no such

16   reasonable doubt.

17           I will submit to you you are supporting the judicial

18   system and you are supporting the jury system as much as when

19   you acquit when there's a reasonable doubt as you do when you

20   convict when there is no reasonable doubt.

21           I said at the beginning of this case that there is a

22   huge doubt.  There is a tremendous doubt.  And then I told you

23   at the beginning that I could look at each and every one of you

24   and submit to you that the just verdict in this case, the

25   verdict that upholds law enforcement, upholds the judicial
```

```
 1   system, that upholds everything is a verdict in all counts of

 2   not guilty as to Kimberly Hastie.  Thank you.

 3           THE COURT:  Okay.  We are going to take a ten-minute

 4   break here in the jury room, please.

 5       [Recess.]

 6           THE COURT:  All right.  Please be seated.

 7           Mr. Knizley.

 8       [Recording played in open court.  Reported to the best of

 9           the Court Reporter's ability and not included as part of

10           the verbatim record.]

11           MR. CRAWFORD:  First and foremost, are we all right

12   with one another?

13           MS. YEAGER:  Yeah.

14           MR. CRAWFORD:  Okay.

15           MS. YEAGER:  Yeah.

16           MR. CRAWFORD:  Just some stressful times.

17           MS. YEAGER:  I know it is.  Why did you think we were

18   not all right?

19           MR. CRAWFORD:  You know, just sometimes --

20           MS. YEAGER:  Well, Victor, you've always been my

21   friend and --

22       [Cross talk.]

23           MR. CRAWFORD:  And I'm your friend.

24           MS. YEAGER:  And I try to tell the truth.  There's so

25   many things --
```

 1              MR. CRAWFORD:  There's so much going on.

 2              MS. YEAGER:  Yeah.

 3              MR. CRAWFORD:  I guess the only other -- I don't

 4    know.

 5              MS. YEAGER:  Well, tell me.

 6              MR. CRAWFORD:  Well, we the only two left.

 7              MS. YEAGER:  I know.

 8              MR. CRAWFORD:  And everything falls on our shoulders.

 9              MS. YEAGER:  Yeah.

10              MR. CRAWFORD:  And there's only so much we can do.

11              MS. YEAGER:  I mean, I think you were in there that

12    day.  I was trying to tell you -- I mean, even if you didn't

13    get a notice of cancellation, we had to check.  You know?

14              MR. CRAWFORD:  Yeah.  Well, I think that was just a

15    simple, little honest mistake.  That's all.

16              MS. YEAGER:  Yeah, yeah.  I mean, I feel like I'm

17    spinning my wheels sometimes, you know?

18              MR. CRAWFORD:  Yeah, so do I.  Join the club.  It's

19    just so much to do.

20              MS. YEAGER:  Yeah.

21              MR. CRAWFORD:  Okay.  I just wanted to make sure of

22    that.

23              MS. YEAGER:  We are fine.

24              MR. CRAWFORD:  And the other thing is, you know, it

25    kind of bothered me, but you remember last month Ms. Hastie

```
 1   told me I had to pay that money back.  She said I could pad my

 2   bill.

 3             MS. YEAGER:  Did you?

 4             MR. CRAWFORD:  No.  I just wanted to let you know

 5   that.  I do not do that.  I got to be around my little baby.

 6             MS. YEAGER:  Yeah.

 7             MR. CRAWFORD:  I do not do that, and I would not do

 8   that.

 9             MS. YEAGER:  I'm with you, Victor.

10             MR. CRAWFORD:  You see my bill goes up and down, you

11   know.  I had my baby the month of July, and I was kind of

12   leaving you half a day.  And then after that was over, I was

13   back.  And then it fluctuated.  But I don't do that.

14             MS. YEAGER:  Hey, it's like father said.  You pay now

15   or you pay later.  I'm with you, you know.

16             MR. CRAWFORD:  I don't do that.

17        [End of video.]

18             MR. KNIZLEY:  That was the tape recording in October

19   of 2012 where Victor Crawford was -- before he got involved

20   with law enforcement -- took his cell phone, his Smartphone,

21   and went into his 24-year friend, Ramona Yeager's office and

22   surreptitiously tape-recorded it.  I think it tells us a lot

23   about the case, and it's a good place to start.

24             We heard on the tape recording first that Victor

25   asked is everything okay between the two of them.  And they
```

1    exchanged the promise or the statement that they are friends

2    with one another.  But Ramona, of course, doesn't know she's

3    being tape-recorded.

4         They go on and talk about -- Victor says that they

5    are the only two left.  And what he's referring to is the

6    23-year relationship at that point that they had had as

7    comrades and friends in the License Commission office.  And he

8    is reaffirming the bond of trust between these people.  And

9    then we go a little bit further and hear him say about did --

10   you've heard Ms. Hastie or said something about Ms. Hastie

11   saying "pad the bill."  And Ramona says, "Well, did you?"  And

12   that tells us that Ramona Yeager doesn't have the intricacies

13   of whatever he may be talking about with Ms. Hastie.

14        And then we hear that Ramona Yeager lives by the

15   creed, like the father said -- and I think Mr. Crawford is

16   correct.  She's probably talking about the priest said -- the

17   priest says you can pay me now or you can pay me later, which

18   supports what the character witness came in here and told us

19   that this lady is a person of faith.  And that's how we start

20   this case, with that tape recording.

21        Now, ladies and gentlemen, as I told you, when we

22   came up here last week when we started the case, I represent

23   Ramona Yeager and Ramona Yeager only, and that is what I'm

24   going to talk to you about today is Ramona Yeager.

25        Now, this is -- this is two cases you are trying.

```
 1    You have the Kim Hastie case and the Ramona Yeager case.  Each

 2    case has counts in it.  The case that Ramona Yeager is

 3    concerned about and I'm concerned about are Counts 1 through 9,

 4    conspiracy to commit wire fraud and mail fraud, and the counts

 5    of mail fraud and wire fraud, Counts 2 through 9.  Conspiracy,

 6    Count 1, the other two.

 7            The Government has told you those cases are lumped

 8    together, and that's basically true.  We'll discuss that in a

 9    moment how they are so.  But I represent Ramona Yeager, and I'm

10    here to talk to you about Ramona Yeager.  And I'm asking that

11    as you receive this evidence that as you have received it and

12    you consider it back in the jury room, every time you talk

13    about it you say, well, what did that prove or not prove in

14    connection with Ramona Yeager.

15            Mr. Hanley referred to the jury.  Yes, you have a

16    tremendous task and role in this proceeding.  You, the jury,

17    are the gatekeepers.  You are the sentinels.  You are the

18    protectors.  You stand between the power and the might of the

19    federal government and your fellow citizens accused.

20            There is no way that the citizen can come against the

21    power of the government without some entity, some way to level

22    the playing field to make the courtroom a fair and just place.

23    And the only thing that does that is you, as the jury.

24            Today you have the power.  You have the authority.

25    Yes.  And you have the duty and responsibility to protect your
```

1  fellow citizens accused from that unfairness of the power of

2  Government.  That's the way our foundation of our system has

3  been designed, to bring the citizens of peers of the accused

4  here to stand between the power of the government.

5         And the Constitution has given us certain guidelines

6  that aid us in being able to do that and the principles.  And

7  those principles begin with the presumption of innocence.

8         Last month, when you came here, you were selected as

9  a jury.  Last week, when you came in here and you began to

10  serve as a jury and up until right now, Ramona Yeager has been

11  presumed innocent.  As you look at her and you talk about her

12  back in that jury room and you talk about this case, talk about

13  that presumption of innocence every time you examine a

14  document.  Every time you listen to a tape recording.  Every

15  time you talk about somebody's testimony, Ramona Yeager is

16  presumed innocent.  And because Ramona Yeager is presumed

17  innocent, the total and complete burden of proof in the case

18  rests upon the prosecution.

19         Ramona Yeager does not have to call any witnesses.

20  She does not have to cross-examine any witnesses.  She does not

21  have to introduce any documents.  Ramona Yeager does not have

22  to prove her innocence.  Not only is the burden of proof

23  falling upon the prosecution but the burden of proof falls upon

24  the prosecution to prove their case beyond a reasonable doubt.

25         And the judge is going to tell you what "beyond a

1   reasonable doubt" means, and Mr. Hanley has told you the

2   definition the judge is going to use.

3          Proof beyond a reasonable doubt is proof of such a

4   convincing nature that you, as a juror, would rely upon it

5   without hesitation in the most important of your own affairs.

6   Proof beyond a reasonable doubt is proof that you would rely

7   upon without hesitation in the most important of your own

8   affairs.  Where your children are going to go to school.  Where

9   you are going to buy a house.  Where is your loved one going to

10  seek medical care.

11         The analogy was made to Victor Crawford -- and I make

12  that analogy to this entire case, if the evidence in this case

13  is of such a convincing character, particularly as to Ramona

14  Yeager -- and what is it that they must prove beyond that

15  reasonable doubt, and we talked about this in the opening

16  statement.

17         And we'll go back to this.  These are the very things

18  that it shows you.  Counts 1 through 9, as the prosecution

19  said, are related.  They all are based on what the Government

20  contends is a scheme or artifice to defraud.

21         Count 1 is a conspiracy count that says Ms. Hastie

22  and Ramona did willfully, knowingly, and unlawfully conspire to

23  commit certain acts and the certain acts they say devised and

24  intending to devise a scheme and artifice to defraud or obtain

25  money and property by means of false, fraudulent pretenses by

1    wire fraud.  That's where the wire comes from.

2            Or -- or and, the judge will tell you it's either

3    one, to devise, intending to scheme, and/or defraud that Ramona

4    willingly, unlawfully devised to scheme to defraud to obtain

5    money and property by means of false and fraudulent pretense,

6    by putting something in the mail.

7            Now, that's the first count that she agrees or had

8    some criminal agreement with Ms. Hastie to do that, to mail

9    fraud and wire fraud.

10           2 through 6, the other -- the next five counts are,

11   again, February to July, Ramona -- that the defendants, Ramona

12   and Ms. Hastie, willfully, knowingly, executed or attempted to

13   execute a scheme or artifice to defraud Mobile County.  That's

14   who they are supposed to be defrauding.  It is supposed to be

15   by false and fraudulent pretenses and representations.  Yeager

16   falsified invoices and misrepresented to the Mobile County

17   Commission that services, political consultants, provided to

18   the Commission instructed -- Yeager instructed a political

19   consulting firm to falsify and alter their invoice to contain

20   false and misleading statements, disguise the true nature of

21   the services.  That's what they said.  So we are talking about

22   using them, using the wire to have a scheme, unlawful, to

23   defraud for money.

24           The last three counts involving Ramona Yeager are

25   7 through 9.  Again, willfully, Ramona, willfully, knowingly,

1  devised and intended a scheme or artifice to defraud Mobile

2  County by fraudulent pretenses and promises.  Falsified

3  invoices, misrepresented to the County Commission that services

4  the political consultants provided to the Commission.  Yeager

5  instructed the political consultant firm to falsify their

6  invoices to hide the true nature of the services.

7       Now, although it's nine counts, one of them says

8  "conspiracy," three of them says "mail fraud, wire fraud" and

9  five of them say "post."  Well, remember the example I gave you

10 in opening statement was it's just one act.  It's one scheme.

11 It is one thing, like they said.  It's all connected.

12       If the man came to fix the air conditioner, like I

13 told you, and he comes to the house and then he fixes the air

14 conditioner and I E-mail my wife and say -- you know, she

15 E-mails me and says the electrician fixed the air conditioner.

16 I E-mailed her back, and I said no, it was the air-conditioning

17 man.

18       So we had a difference in five different E-mails as

19 to was it air-conditioner man or electrician.  And then we paid

20 the bill in three different bills, three different pieces, and

21 we send three different checks out.  Well, that's five dealings

22 of wire in the E-mails and three dealings of the checks and one

23 conversation, but it's one act.  So it's the whole thing.

24       So when you consider this case against Ramona, it is

25 one thing.  If you don't believe that she knowingly, falsely

1    did something, then you should acquit her of every single

2    thing.  And it's extremely important not to say, well, maybe

3    one or maybe another.  No.  If she's not done anything wrong,

4    acquit her of -- if she has not done the acts alleged in the

5    indictment beyond a reasonable doubt, acquit her of everything.

6          Now, how do they prove these allegations of the

7    indictment?  What do you have to rely upon?  How do they prove

8    it beyond a reasonable doubt?  The only thing you can consider

9    in determining that is the evidence in the case, the testimony

10   that comes this, the tape recordings, the documents.

11         You can't speculate.  You can't guess.  You are not

12   supposed to.  You say what is the evidence that proves this

13   case beyond a reasonable doubt.  What do they start with?

14   Well, again, Ramona is only in these first nine counts, and

15   these first nine counts only involve the Strateco bills that

16   took place, not the one in 2012, not anything to do with the

17   televisions, not anything to do with the campaign contribution.

18         Her only involvement, the only allegation against her

19   is the three invoices that were -- that involved Strateco and

20   Wes Gunter and Chad Tucker in early January to July 2014.

21   That's all Ramona has.  So let's look at that first.

22         Chad Tucker.  And the witnesses that touch her, I

23   suggest, ladies and gentlemen, is Chad Tucker, Wes Gunter, and

24   Victor Crawford.  That's really the only significant witnesses

25   that you can consider when considering Ramona Yeager's case.

1    Chad Tucker.  Chad Tucker was the gentleman that came

2    up here, and he was Strateco.  He owns Strateco.  And he is the

3    one who got the money on the bills that they claim Ramona had

4    something to do with making false and Ramona intended to

5    defraud the County Commission by sending an E-mail by them and

6    by sending checks in the mail.

7         Well, what did Chad say about Ramona?  Nothing.

8    Nothing.  I don't think Chad mentioned her name but certainly

9    didn't say that she talked to him, did anything toward

10   encouraging him to change a bill, to make something fraudulent.

11   Chad told us the bills were honest work.  The bills were

12   correct, and they represented the work that was done for an

13   honest wage.  There's nothing false about the bill, period,

14   paragraph.

15        Chad Tucker said he wouldn't have taken tax money for

16   something that he wasn't supposed to.  So it wasn't political.

17   It was something within the framework that should be done, and

18   he never spoke to Ramona about it.  She had nothing to do with

19   that.

20        Wes Gunter, the other gentleman that worked for him.

21   What did she say -- excuse me -- what did he say about Ramona?

22   Wes says, if you recall, that early on when he first sent the

23   bill, Wes sent the bill to Ms. Hastie and it had Ms. Hastie's

24   name on there; that they didn't like it.  Ms. Hastie didn't

25   like it.  Ms. Hastie had it changed, and then they began to

1    change the content of it.

2           But Wes Gunter and Chad Tucker said that content

3    change did not misrepresent one thing.  It was exactly what

4    they did.  The top thing misrepresented something.  They billed

5    APL, or Bienville Rock.  There was nothing misrepresented, but

6    Ramona had nothing to do when that changed from Kim Hastie to

7    Bienville Rock came about in February.  Even their chart shows

8    us they -- Gunter to Victor, Kim Hastie consulting.  Gunter to

9    Hastie.  Payment reminder.

10          Strateco consultant Gunter to Hastie.  When?  Back in

11   April.  Nothing goes to Ramona until May.  And if you recall

12   Mr. Gunter's testimony about whether Ms. Yeager was involved.

13   She was at a meeting, at least one, he said, because she was

14   employee of the month, he said.  But she did nothing to

15   facilitate the billing of it, just like he would bill anything

16   else.

17          So for Mr. Tucker and Mr. Gunter, we don't get any

18   information that Ramona has done anything wrong, has done

19   anything inappropriate.  Nothing.  I mean, look at the

20   testimony.  They certainly didn't say that she defrauded

21   anybody or tried to defraud anybody or encouraged anything.

22          So where are we getting that from?  We are getting it

23   from Victor Crawford only, and we start with Victor Crawford

24   taping his 24-year-old -- 24 years of friendship in her office.

25          Now, what we are going to listen to -- we listened to

```
 1   snippets, if you remember.  We listened to snippets.  For
 2   whatever reason, we didn't play all the tapes.  But after three
 3   or four months of tapes, we played snippets of Ramona, and this
 4   is the snippets of Ramona they gave us -- they gave you, not
 5   us, they gave you to rely upon that says that she was part of
 6   some fraudulent scheme.  Now, take a few minutes to hear them.
 7        [Recording played in open court.  Reported to the best of
 8        the Court Reporter's ability and not included as part of
 9        the verbatim record.]
10           MR. CRAWFORD:  What about the [inaudible]?
11           MS. YEAGER:  You didn't get paid?
12           MR. CRAWFORD:  No, I haven't gotten anything.  I
13   called over there to check on it, and they said they hadn't
14   seen it.
15           MS. YEAGER:  Let me --
16           MR. CRAWFORD:  Wait, wait, wait, wait.  What about
17   the billing, the expenses?  What am I supposed to -- have you
18   talked to Commissioner Hastie about that?
19           MS. YEAGER:  She told me that she had had that -- she
20   had the bill, but she wanted them to change something on the
21   bill of the way they had it worded.
22           MR. CRAWFORD:  Who are "they"?
23           MS. YEAGER:  Whoever is doing it.  Whoever it's going
24   to.  Who are they paying?
25           MR. CRAWFORD:  Are you talking about Strateco?
```

```
 1              MS. YEAGER:  Yeah.  Is that the bill you are talking

 2   about?

 3              MR. CRAWFORD:  Yeah, one of the expenses.

 4              MS. YEAGER:  Okay.

 5              MR. CRAWFORD:  I'm going to put in --

 6              MS. YEAGER:  You are going to have two this month;

 7   right?

 8              MR. CRAWFORD:  Yeah.

 9              MS. YEAGER:  But we probably need to look at the one

10   that you haven't submitted and see how it's worded.

11              MR. CRAWFORD:  Well, what I'm asking -- yeah, we've

12   got to look at it to see.  What I'm asking is -- what am I

13   asking?  You are talking to Ms. Hastie -- I'm going have to

14   resubmit that -- this is April.  I'm going to have to resubmit

15   the March bill?  Because I can't find it over there.  That's

16   what we are talking about.

17              MS. YEAGER:  How long did it --

18              MR. CRAWFORD:  Am I going have to resubmit that with

19   these expenses on it?

20              MS. YEAGER:  I would have to find out.

21              MR. CRAWFORD:  Or am I doing a supplemental just

22   expenses?

23              MS. YEAGER:  Okay.  Okay.  I'll find out today.

24        [End of video.]

25        [Recording played in open court.  Reported to the best of
```

```
 1        the Court Reporter's ability and not included as part of
 2        the verbatim record.]
 3            MS. YEAGER:  Hello.  Did you ever locate [inaudible]
 4   of the county?  Uh-huh.  You resent it.  Okay.
 5            MR. CRAWFORD:  She resent it.
 6            MS. YEAGER:  Uh-huh.  That was yesterday, wasn't it?
 7   The day before?  Monday.  Okay.
 8            MR. CRAWFORD:  [Inaudible].
 9            MS. YEAGER:  Who did you send it to?  They don't --
10   but they didn't want to go to their own and [inaudible].
11            MR. CRAWFORD:  So you go ahead and --
12            MS. YEAGER:  She resent it.
13            MR. CRAWFORD:  Are they going to retract it and put
14   it --
15            MS. YEAGER:  Uh-huh.
16            MR. CRAWFORD:  So do them all at one time?
17            MS. YEAGER:  Okay.  So Judy has got it.  Okay.  They
18   didn't want to go in his office.  Okay.  Okay.  Bye.
19            Well, I don't know, Victor.  We'll have to ask her
20   because I don't want him to get one -- get that other bill and
21   then we send something else.
22            MR. CRAWFORD:  All right.
23            MS. YEAGER:  I don't want to him think we're trying
24   to do something underhanded or it may bring attention to that
25   Strateco or whatever.  I'm going to ask Ms. Hastie.
```

```
1              MR. CRAWFORD:  All right, then.

2         [End of video.]

3         [Video played.]

4              MR. CRAWFORD:  Okay.  So basically you are going to

5    ask Ms. Hastie if --

6              MS. YEAGER:  If she wants to resubmit.

7              MR. CRAWFORD:  Pull it or resubmit or submit a

8    supplement.

9         [Cross talk.]

10             MS. YEAGER:  Due by the next month.  Okay.

11             MR. CRAWFORD:  All right.

12             MS. YEAGER:  Did you pay people?

13             MR. CRAWFORD:  No.  I think I paid -- I haven't got

14   paid.

15             MS. YEAGER:  So, in other words, they are not going

16   to get paid until you get paid.  So she wants them to have the

17   first month and second month [inaudible].

18             MR. CRAWFORD:  Uh-huh.

19             MS. YEAGER:  Okay.  Okay.

20        [End of video.]

21        [New video.]

22             MR. CRAWFORD:  Oh, am I -- is there a May invoice

23   coming?

24             MS. YEAGER:  Is there a what?

25             MR. CRAWFORD:  Is there a May invoice for Strateco?
```

1        MS. YEAGER:  I have --

2        MR. CRAWFORD:  Is there a May invoice?  What's that

3    one there?

4        MS. YEAGER:  This was the April.  Remember Ms. Hastie

5    wanted them, too?  May -- no.  This one is April's.

6        MR. CRAWFORD:  Okay.  Am I getting a May?  I'm ready

7    to turn in my -- you know, I was turning in the bill.

8        MS. YEAGER:  Well, Ms. Hastie gets these other three.

9        MR. CRAWFORD:  Well, you gave me E-mail.

10       MS. YEAGER:  But I mean -- oh, they E-mailed them to

11   you?

12       MR. CRAWFORD:  Uh-huh.

13       MS. YEAGER:  Have you paid them?

14       MR. CRAWFORD:  Yeah.  Is there a May one coming,

15   though?

16       MS. YEAGER:  I haven't seen it.

17       MR. CRAWFORD:  Oh, okay.  You don't know if the

18   May one is coming.  Excuse me one second.  Is that your

19   [inaudible].

20       MS. YEAGER:  That's yours.  Did you eat lunch?

21       MR. CRAWFORD:  I didn't eat lunch.

22       MS. YEAGER:  Is that your new employee?

23       MR. CRAWFORD:  Yeah.  We're working on getting it

24   [inaudible] the Office Pro, so we do anything [inaudible] just

25   like I'm here in the office.

```
 1              MS. YEAGER:  That's nice.

 2              MR. CRAWFORD:  Yeah.  That will be nice.

 3              Okay.  So I can go ahead and make up my --

 4              MS. YEAGER:  I guess so.  Because, see, you had

 5   paid -- you paid these people.

 6              MR. CRAWFORD:  Uh-huh.

 7              MS. YEAGER:  How did you pay them?

 8              MR. CRAWFORD:  Check.

 9              MS. YEAGER:  I mean, did they request it?

10              MR. CRAWFORD:  Yes.

11              MS. YEAGER:  I guess we could E-mail them.  See, I

12   just -- let's see.

13              MR. CRAWFORD:  Ms. Hastie is not going to be in

14   today?

15              MS. YEAGER:  She told Katie that it would probably be

16   after a week.  They are gone.

17              MR. CRAWFORD:  Okay.

18              MS. YEAGER:  All right.

19              MR. CRAWFORD:  Katie's leaving at 3:00, in an hour,

20   so I just want to get my -- get my invoices ready.  Do you know

21   when it is this month?

22              MS. YEAGER:  We always had --

23              MR. CRAWFORD:  June.  I was just trying to get my

24   bill in.  I'm just trying to get my bill in.

25              MS. YEAGER:  For May.  Because this is just
```

1    June 9th.

2           MR. CRAWFORD:  Yeah, yeah, yeah, yeah.  All right.

3    Yeah.  I'm asking you was Strateco coming for May.

4           MS. YEAGER:  I don't know.

5           MR. CRAWFORD:  Because I'm trying to get my invoice

6    in before it gets too late in June.

7           MS. YEAGER:  Yeah.

8           MR. CRAWFORD:  With the County holidays.

9           MS. YEAGER:  But did you pay them any money in May?

10          MR. CRAWFORD:  For what was owed for the last

11   invoice.

12          MS. YEAGER:  You did.  January -- no.  February,

13   March, and April?

14          MR. CRAWFORD:  Uh-huh.

15          MS. YEAGER:  Have you claimed this April?

16          MR. CRAWFORD:  No.

17          MS. YEAGER:  So if you didn't pay them anything in

18   May, then you -- did you get the invoices before you paid them

19   or after you paid them?

20          MR. CRAWFORD:  No.  We -- the invoices that we got, I

21   got -- that I turned in were February and March.  I haven't

22   turned in reimbursement for --

23          MS. YEAGER:  April?

24          MR. CRAWFORD:  April.

25          MS. YEAGER:  Yeah, I've got this.

```
 1              MR. CRAWFORD:  You gave me April in the hallway,
 2   remember?
 3              MS. YEAGER:  Well, I think Ms. Hastie had them change
 4   it.
 5              MR. CRAWFORD:  Okay.  So I'm just wondering May just
 6   completed, and I just need some direction.  Was I going to get
 7   something for May?  If not, I'll go ahead and make my bill up,
 8   do my invoice for my time, and have that ready for you for, I
 9   guess, Monday now.  That's all.  You can let me know.
10              MS. YEAGER:  Just -- see, the only way I got involved
11   with it was because she didn't like it because it had Kim
12   Hastie and worked on this.
13              MR. CRAWFORD:  Okay.  I'm just holding up turning in
14   my invoice, trying to see if I'm expected -- if I should expect
15   another one.  I just don't know.  I just need some direction.
16   If not, I'll turn in my invoice and get paid.  That's all.
17              MS. YEAGER:  They haven't sent me anything.
18              MR. CRAWFORD:  Okay.
19              MS. YEAGER:  We were supposed to have a meeting with
20   them today [inaudible].  Do you want me to call them?
21              MR. CRAWFORD:  If you want to.
22              MS. YEAGER:  581-9481 -- wait.  [Inaudible].
23              MR. CRAWFORD:  [Inaudible.]
24              MS. YEAGER:  Well, we had a meeting.  And the next
25   meeting, they had a different guy that they just hired.  I
```

1    don't know who these people are.  Not answering.

2         [End of video.]

3              MR. KNIZLEY:  "I don't know who these people are."

4    Only way I got involved is Ms. Hastie wanted to change

5    something in the bill.  This bill for who?  For what?

6              Does that sound like the person who has designed some

7    scheme or artifice to defraud someone, or does it sound like

8    the efficient clerical person that became the Deputy

9    Commissioner in March of 2014, the efficient clerical person

10   that was moving along the bill, just like she's moved along

11   every other bill for this man.

12             There is nothing in there that suggests there's

13   anything that she's trying to hide, there's anything that she's

14   trying to cheat somebody, there's anything fraudulent.

15             They are going to point to and say, well, what about

16   her saying they don't want to bring attention to that bill.

17   Well, the bill over there has no "Strateco" on it.  This man is

18   owed $38,000, and he needs his paycheck.  And that's why he's

19   in there in front of his 24-year friend asking about.

20             He says -- she says that I sent the other -- he's the

21   one that's talking about resubmitting, not her.  He's the one

22   talking about resubmitting with the Strateco bill, not her.

23             Then he -- she tells him if you need to resubmit that

24   bill with some other bill on there, that's going to draw

25   attention to it, and you may not get your paycheck.  And I

1  submit that's what she was talking about.  Or maybe she was

2  talking about some feud that Jerry Carl and Kim has or that he

3  had with Jerry Carl or I don't know.

4          But I think the answer is, you probably don't know.

5  But to make it anything sinister, as they may want it to be,

6  you are going to have to guess, you are going to have to

7  speculate.  And I think you take it into the context of those

8  ten minutes you just watched and this lady has no criminal

9  intent about anything.

10         She's just, as she's been portrayed, a dedicated

11 public servant.  Why should she be concerned about the Strateco

12 bill?  There's no reason.  Why should she be concerned about

13 the social media bill?  There's no reason.  This is the very

14 same person that two years earlier Chad Tucker, when he was

15 Mobi-Media, that Victor went and made the bill for $10,000 that

16 Ramona got processed through is the same kind of bill that we

17 had with Wakefly, that was social media for $20,000 a couple of

18 years earlier.  And this is just another one of those bills.

19 There's nothing that she should be concerned about whatsoever.

20         Now, to make her having something to do with the

21 criminal aspect of this, if there was any criminal aspect of

22 it, which I suggest there is not, you're going to have to say,

23 first, all right, Ramona, you sure know about this contract,

24 don't you, and you sure know what the License Commissioner can

25 do, you sure know that the contractor shall provide personnel,

1   you sure know that this is an agreement with the County

2   Commission and the License Commission, and you've read all this

3   and you know that whether or not Ms. Hastie can use personnel.

4   The contract says the contractor shall provide additional

5   personnel from time to time, as needed as requested by the

6   License Commissioner, the contractor's personnel shall perform

7   the work and tasks as assigned by the License Commissioner.

8          There's no evidence that she knows anything about

9   that, and if she did know something about it, she wouldn't know

10  to look.  And, heck, it's not her job and responsibility.  I

11  guess Ms. Hastie could do that.  I don't know.

12         But there's no evidence she knew about it.  There's

13  no evidence that she had anything to do with it.  She simply is

14  processing the bill.  And who said that in his conversations

15  with the cross-examination that I had with him right after we

16  played those tapes earlier -- I asked -- and what I remember is

17  not important.  It's what Mr. Crawford said.  What they

18  remember Mr. Crawford said is not important.  What y'all

19  remember Mr. Crawford says is what's important.

20         But what I recall Mr. Crawford saying is something to

21  the effect that the reason they kept both of them -- kept

22  asking about Ms. Hastie this and Ms. Hastie that because, I

23  think, Ms. Hastie was the one who was sort of handling that

24  bill, not Ramona.  And I recall him saying that was fair.  So

25  would it be fair to say that both you and Ramona were looking

1   to Ms. Hastie about the details of the bill, and I recall he

2   said that's fair to say, yes, I guess, at that point.

3          And, most importantly, he says -- as I recall, two

4   things.  The most important thing, she says, I don't want

5   anybody to think I'm being underhanded.  Now, she's on tape,

6   and she has no idea he's taping her.  But she wants to make

7   sure that nobody thinks it's underhanded.

8          Now, if Mr. Crawford wanted to do something, if he

9   wanted to catch her at this and say, oh, yeah, yeah, yeah, I'm

10  worried about this, too.  Aren't you worried about what Kim

11  said about this?  Never happens.

12         Just like when he had an opportunity to go into Kim's

13  office, when he taped her that one time, he didn't do that

14  either.  He had every opportunity to say, Ramona, you are my

15  24-year friend.  Hey, I trust you.  Remember our first day?

16  Man, we are the only two left.  I've got to talk to you about

17  it, just like he said he wanted to talk about the padding of

18  the bill.  Ramona, don't we need to talk about this Strateco

19  bill, something being wrong with it.  Never happened.

20         If she had any criminal involvement -- but the reason

21  he doesn't ask that, Ramona would look at him and say, "Victor,

22  what are you talking about?  It's the same kind of bill you did

23  with Chad in 2012.  It's the same kind of bill you did with

24  Wakefly.  Well, why are you saying something is wrong with this

25  one?  Well, why would you say I know something about it."  Did

1   something happen?  Tell us.

2           They had three months of total control, and that's

3   what they bring you to base their case upon.  That's it, and

4   there's nothing more.

5           But the most important thing Crawford says when she

6   says the only way I got involved in it -- and she says that's

7   the only way she gets involved in it is because Ms. Hastie

8   wanted some words in the billing.  She doesn't mention anything

9   about the substance of what it was for but simply the words,

10  the bill and the wording.  That's correct.

11          And would that be consistent with what her job is

12  since you've been there to look at the bill, make sure the bill

13  is correct mathematically, arithmetic, make sure that's done,

14  forwarded to Ms. Hastie for her signature before going to the

15  County.

16          Yes.

17          Is that fairly consistent with what Ramona does in

18  relation to your bill?

19          Yes.  That's fairly consistent with what she does.

20          She doesn't have anything to do with the substance of

21  the bill.  She doesn't have anything to do with the

22  decision-making.  She doesn't have anything to do with that.

23  She's just the person processing the bill, and you have to

24  speculate from that point forward.

25          And I submit to you, ladies and gentlemen, that's the

1    whole case.  And you can go ahead and say right now, Ramona

2    Yeager, there is no proof at all that Ramona Yeager had

3    anything to do with devising some fraudulent intent and that

4    the only way -- that's even brought up is by what these people

5    want you to speculate about.

6            Well, let's talk about what these people may have

7    asked you to believe during the course of this case.  Chad.

8    Wes.  Victor Crawford is the other player.  Tell us about

9    Victor Crawford and the type of person that they brought up

10   here and the person they asked you to rely on.

11           And let me say one more thing before we go forward on

12   the conspiracy counts.  On the conspiracy count, you hear some

13   jury charges.  One important part of it is, is that you may see

14   that she may have done something and pushed the bill along or

15   something of that nature and that they will tell you that if

16   she has a minor role that she could still be somewhat

17   responsible.

18           But simply being present at the scene of an event or

19   merely associating with certain people and discussing common

20   goals and interests doesn't establish proof of a conspiracy.

21   Also, a person who doesn't know about a conspiracy, but happens

22   to act in a way that advances some purpose such as sending the

23   bill along doesn't automatically become a conspiracy.

24           But what do we have to rely upon, though?

25   Mr. Crawford.  Well, we'll get to Mr. Crawford.  Remember the

1     motives that we talked you?  I told you in opening statement

2     she had no motive, and she still has no motive.  She's been

3     working there 40 years.  She can retire when she wants to.

4     She's as high as she's going to get.  She's not going to get

5     any farther.  There's no moving up.

6           Well, they scratch their head and they come back in

7     closing argument and say, well, Ms. Hastie is mean and fires

8     people, so maybe she would have fired her.  Okay.  If that's a

9     real motive, well, you've the burden of proof beyond a

10    reasonable doubt.  Where is your evidence of that?  Where is

11    any evidence that she's going to fire Ramona if Ramona doesn't

12    act in an extreme serious felony offense?  That's just total

13    speculation.

14          And it's speculation about a lady who has been

15    married 38 years to this gentleman over here, has three

16    children, has grandchildren, has been working at the License

17    Commission for 41 years, and has been a dedicated public

18    servant for three commissioners -- Thornton Price-Williams,

19    Ms. Norris, and Ms. Yeager.  And she's the epitome of what we

20    should want in a public servant.

21          And after 41 years of doing that, then all of a

22    sudden start committing criminal acts?  That's just not in the

23    character, and it's just preposterous.  It is absurd to think

24    Ramona Yeager has got something to do with some fraudulent

25    intent to defraud the county government, defraud the County

1       government.

2               Well, who is the county government?  Who the County

3       Commission?  We saw him.  Jerry Carl.  Now, if these people say

4       that Ramona has something to do with defrauding the county

5       government, I want to hear about it.  I want to hear from the

6       county government.  I want to hear from the county

7       commissioner.  Stand up here and tell me I've been defrauded.

8       They have got the burden of proof.  What should they ask Jerry

9       Carl?  Mr. Carl, is this bill fraudulent?  Did you know

10      anything about this bill?  You paid it.  No.

11              Connie Hudson.  Merceria Ludgood.  None.  You know

12      why?  Because they don't want the answer.  Because the answer

13      is going to be, "We wouldn't feel we'd be defrauded," the same

14      answer that Victor didn't want.

15              The same answer that Victor didn't want when he

16      should go downstairs and talk to Kim.  The same answer Victor

17      didn't want when Ramona said, "We don't want to do anything

18      inappropriate."  He could have said, "Oh, yeah, I can't.  Yeah.

19      I'm worried about that."  They don't want the answer.  They

20      want you to speculate because the answer's not what they want.

21      And it's sort of like what they did with Victor Crawford.

22              Victor --

23              THE CLERK:  Mr. Knizley, four minutes.

24              MR. KNIZLEY:  Victor Crawford.  First thing, Victor

25      Crawford is a thief.  Victor Crawford stole from you $82,000.

1   And Joe Ruffer, just because he was his friend, didn't turn him

2   in.  Let him pay it back.  He's a thief.  He's a liar.  He took

3   to Jefferson County to go up there and get money from the

4   Jefferson County people to get and steal money from those

5   people.

6          And he told you -- we had four employees.  We had

7   four people, and he said we currently have four employees.  And

8   when I asked him, I said, "Well, that's not the exact truth."

9   Do you remember me asking that?  What kind of truth is it?

10          He's a thief, and he's a liar.  He took $195,000 of

11   money when he double-billed on Katie and then comes here and

12   said, "Oh, I had some expenses."

13          But that's not the worst part of it.  The worst part

14   about it -- the worst part of it and the most offensive part

15   about it is he's trying to defend it, and that tells you more

16   about this case than anything else.  He told the circuit court

17   of Mobile County under oath and filed a document that said

18   that's his income.  And then you have a place to put on there

19   other related income.  He put nothing.  And then he said, I

20   understand that I will be required to maintain recent documents

21   in preparation, including any most recent tax returns.  And

22   they defended it.

23          And you know what they did the next day when he

24   didn't put -- we know he stole all the Katie money.  I ain't

25   worried about that.  I'm worried about this $150,000, and he's

1    talking about subchapter S.  Well, they said, "Oh, here is his

2    tax return."  And, by the way, we don't have his tax return.

3    We got three pieces of paper.  We don't have anything close to

4    his tax return.  Here it is, count that up times 12 times 1250.

5    That's 150.  Yeah, it sure is.  Why don't we count the other

6    income, the subchapter S corporation schedule E?  We don't have

7    schedule E.  The other 50 -- $49,000 worth of income.

8           I will bet you if anybody paid child support, I would

9    sure like to be able to leave off $50,000 if I got to pay when

10   I can go lie to the court back there.  And that's his income.

11   Right there.  And they want to defend him and say, "No, no, no.

12   He's telling the truth."  Well, his whole return is a lie.

13   It's a lie.  And they are protecting the crook, the thief, and

14   the liar.  He lied.  He stole from Joe Ruffer.  He lied to

15   Birmingham, and he's a crook.

16          Oh, but what about his expenses?  Well, to get to his

17   $49,000 worth of income, he takes what he tells us is $33,000

18   worth of Statement 1, which we don't have -- it didn't get

19   brought.  Okay?  -- of employee benefits programs.  Wow, Katie

20   says she didn't have any.  We also got $69,000 of other

21   deductions.  Wow.  We got a total of $429,000 worth of

22   deductions he claims on his income tax return, but they won't

23   give us the rest of this to see where it's from.

24          You know why?  Because they want to trick you.  And

25   you should send them a message and say, no, sir.  I'm not being

1    involved in that in any way.  That's not what my government is

2    about.

3           And when it comes today that people like this come in

4    here and talk to a jury like you and ask you to convict a

5    wonderful, sweet woman like this on the evidence of people like

6    Victor Crawford, we might as well burn the courthouse down

7    because there is no justice.

8           Ladies and gentlemen, this case will be yours in a

9    little bit.  They're going to cut me off, but you heard

10   Mr. Hanley say and you've heard me say that you are the

11   gatekeepers.  You are the guardians.  You are the only thing

12   that protects a free society from the power of government.

13          And 240 years ago, we designed that system, and we

14   had people like Thomas Jefferson and Alexander Hamilton and

15   James Madison.  They designed that Constitution.  And they get

16   people to hear you, and they said we going to have reasons to

17   keep the king, the crown, away from us.

18          THE COURT:  Mr. Knizley, you have two minutes to wrap

19   it up.

20          MR. KNIZLEY:  Yes, ma'am.

21          We're going to have -- I've got a lot more to tell

22   you, but I'm going to have to cut it off.  We're going to have

23   reasons to keep that king and crown away from you.  We're going

24   to have rules of justice when you come into the courtroom and

25   we're going to say that no, we get a jury of your peers and

1   you're going to prove this case beyond a reasonable doubt.

2   You've got to prove -- you've got to come up with a burden of

3   proof, and these people are presumed innocent.

4          And that's what it means, really, presumed innocent.

5   If they were sitting in the front row -- James Madison and

6   Alexander Hamilton and Thomas Jefferson were sitting in the

7   front here, a tear would come to their eye for what these

8   people are doing to your system.

9          I ask you, ladies and gentlemen, go back in that jury

10  room and remember the concepts of presumption of innocence and

11  burden of proof and reasonable doubt and remember the

12  weaknesses of the case and remember what they've done about

13  Victor Crawford in this case and remember how they tried to

14  protect the thief, the crook, and the liar when they try to put

15  some wonderful lady like this in jail -- excuse me -- convict

16  this person.

17         And go back there and think about that and talk about

18  it, and you will come to the conclusion that Ramona Yeager is

19  not guilty.  And you can come back here and you can sit here

20  and come up and raise your hat and come out and proudly

21  announce that you have found Ramona Yeager not guilty.

22         And when you do that, when you walk out of this

23  courtroom, Alexander Hamilton and Thomas Jefferson and James

24  Madison in the front row, they will shake your hand because you

25  have done the right and just thing.  Thank you.

```
 1            MR. BORDENKIRCHER:  Just a second, Your Honor.  Let
 2  me set up.
 3            THE COURT:  Mr. Bordenkircher, the Government has
 4  45 minutes left to wrap up their summation.
 5            And then I will give you the instructions on the law.
 6            MR. BORDENKIRCHER:  Sinan, can you just bring that
 7  over here.  Right there, that timeline.
 8            MR. KALAYOGLU:  Sure.
 9            MR. BORDENKIRCHER:  Good afternoon, ladies and
10  gentlemen.  How are y'all?
11            3,000 years ago, Moses walking through the desert.
12  And he's got some people with him, and he tells a story.  He
13  tells a story about fish, which is kind of unusual when you are
14  in the desert.  And it's 3,000 years ago.  But he tells a story
15  that I think tells us a lot about ourselves.
16            It tells a story that some fish are good and some
17  fish aren't.  He says a fish with scales and fins is good.  You
18  can eat it, but a fish with no scales but fins is not any good.
19  But then he says -- and this is a riddle -- a fish with scales
20  but no fins is good.  And then he waits and says there are no
21  fish like that in the world.
22            Now, that's something to think about later on, the
23  story of how he knew that 3,000 years ago living in the desert
24  that there were no fish like that, but that's for another day.
25            But what does he mean by that?  Fins are used to move
```

1   people forward and move the fish forward and for people to move

2   forward and have ambition.  And drive is good to a degree.  The

3   scales on the fish, though, protect the fish from insects and

4   disease and things that are going to be by it.  So while the

5   fish can move forward, the scales protect it.

6           How does that apply to a human being?  We have

7   ambition and drive, and that's good.  And if you have scales

8   around you, you have a moral compass, a drive to be better than

9   yourself, to be, in a real sense, to be first you must be last.

10  You must put people before yourself, and it's that moral

11  compass that works around us that controls the drive forward.

12          But if you lose the scales, you become something

13  completely different.  You are driven by yourself, by ambition,

14  and caring only for you and your needs.

15          Now, how does that relate to this case?  Well, let me

16  just tell you something, ladies and gentlemen, if you have fins

17  but no scales, you become "all about me."  And that's how this

18  case started.

19          I don't disagree that back in 2008 when Defendant

20  Hastie started she had good intentions.  But did they stay or

21  did her own ambitions drive her to drop her scales slowly, but

22  surely, and to defraud the government of Mobile County?

23          When I say defraud the government of Mobile County, I

24  really mean the taxpayers because that's the heart of this

25  case.  While defense counsel will argue that the description is

1  right, you've noticed they never show who the payment's going

2  to.  That's the fraud right there, who is actually paying for

3  this.

4       Remember when Neil Hanley opened up, and he said

5  Mobi-Media did computer technology work.  I wrote it down.

6  They went in and fixed the computers.  Is that true?  No.

7  Nobody did that.  He said that Victor and Ms. Hastie worked

8  together.  Is that true?  No.

9       Now, as we are going to walk through this case, you

10  are going to see a series of lies by the defendants, one after

11  another after another, and how a moral decay became a drive for

12  this woman to combine these offices and take over the offices.

13  And you'll have the bill that's on her desk, the bill that was

14  on her desk.  The only bill that's in evidence shows her

15  getting a huge raise.

16       Now, we had Mr. Gray saying, well, the bill's been

17  changed, and it's in -- where is that bill?  That's an

18  important thing to remember.  The only thing that you can

19  consider is what is actually in evidence and comes from the

20  testimony.

21       So you heard a lot of statements about witnesses that

22  weren't here, mainly from the defense counsel.  They kept

23  saying -- well, one attorney is going to say this and some

24  someone from Montgomery is going to say this and they are going

25  to say this.

1    Well, the reason we have cross-examination and the

2  way this works in our system and I would agree this is the best

3  system in the world is because the only -- you are the arbiters

4  of truth.  We don't let somebody say something about what

5  somebody else said.  In fact, when you get the instructions,

6  you are going to see that the judge cautions you about an

7  attorney saying the same thing over and over and over again.

8    Now, I haven't been here as long as Mr. Hanley, but

9  there's an old trick among attorneys, and the trick is they'll

10  send a letter out and say X.  Well, in this case they'll say

11  that you get a letter that says the moon is made of blue

12  cheese.  You don't respond.  The moon is blue cheese.  Well,

13  they didn't respond.  Obviously, the moon is made of blue

14  cheese.  Well, just as Mr. Hanley kept saying this person from

15  Montgomery is going to testify, they didn't testify.  The

16  person that they had, this AG opinion, that said this was

17  right.  That's not evidence.  None of that is evidence.  But

18  they keep saying it just like it's going to save $1 million.

19    Do you remember Mr. Sessions that came in who is in

20  favor of the merger?  Do you want him controlling your

21  business?  Did it look like he even knew where the License

22  Commission is?  No.  He's a little crony of the defendant.

23  Fine.  You can bring in your political cronies to support you,

24  but the simple fact of the matter is it's not true.  There's no

25  evidence of it.  So let's get right to it.

1    These are the lies that the defendant has told, and

2    it's just not me saying it.  We opened this case with the

3    defendant on T.V.  What did she say?  I did not turn those

4    E-mails over.  We know that's a bold-faced lie.  How do we know

5    that?  Mr. Bray said it.  Ms. Cooksey sat there and said, yes,

6    I gave those E-mails to her.  There is no other evidence.

7    Now, Mr. Hanley would like to say, well, the law says

8    that E-mails are not personal information.  Well, Mr. Hanley is

9    not the arbiter of the law.  You are the arbiter and decider of

10   the facts.  The judge is the arbiter of the law.

11   The No. 1 tax collector in Mobile County wants to try

12   to say, "personal information, including" -- and then it goes

13   on.  It doesn't say "only."  It says "including."  In fact, the

14   judge -- if the judge doesn't say this, you can say,

15   "Mr. Bordenkircher, you are a nut."

16   The term "personal information" means information

17   that identifies an individual, including an individual's E-mail

18   address, photographs -- wait, wait a minute.  I guess I missed

19   that.  Including an individual's E-mail address.  Well, why

20   would he say that?  Is it like the technology stuff that's

21   going to happen that never gets done and that they actually

22   worked together.  So not only is Count 17 proven, that's a lie.

23   The next lie -- and you can take notes here because

24   what I've done is listed the exhibit and where you can listen

25   to it on tape.  So don't take my word for it because what I say

1  is not evidence and so just throw what I'm saying out.

2            "I didn't pay him," Chad, with a merger of offices.

3  We know that's not true.  Chad Tucker said in February that's

4  all they worked on was the publicity for the merger of the

5  office.  Why?  On behalf of her political desires.

6            Now, here's the nugget of the case, if the County

7  wanted to pay for that, they could have gone to the County

8  Commission, presented the bill and a contract, and the County

9  could say, yes, we would like to pay for your political

10  campaign and we are going to pay $10,000.  Was that done?  No.

11            Ms. Herman, in fact, said you cannot spend county

12  money unless there's a contract.  So she violated county law.

13  But for whose benefit?  For her own benefit.  So she lied.

14            And if you look at 108, 114, and 174, you'll see

15  where she's talking about her merger.  Her needs.  Her needs.

16  Scales slowly falling apart.

17            And that kind of goes back to here on these gifts.

18  Imagine, if you will, you are in your workplace, and your boss

19  has told you 1,000 times, I'm going to fire you, and then comes

20  in and gives you a list, get these T.V.'s.  And then when you

21  don't do anything, sends her secretary in.  "I don't really

22  want to say this, but she wants the T.V.'s."  Could you

23  imagine?  Really?

24            Is that what we want from a public servant here in

25  Mobile County when she knows it's a violation of state ethics.

```
 1   Now, that in and of itself doesn't prove the crime and that's

 2   going to be in the instructions, but what it does show is her

 3   intent.  She received the ethics training.  She knows she can't

 4   do it, but she does it anyway.  That shows her intent to

 5   violate that and then hit him up.  That's these counts.  So it

 6   starts in 2009.  That's 43A.  Goes to Count 11, 43A, the

 7   Mobi-Media invoice.  We'll come back to that.

 8           Then it goes to 2012 and then 2013.  I want to hit on

 9   the 2013 because that is -- that is a key part of it.  Because

10   in 2013 you have a piece of evidence -- if you go back and look

11   at it, in 2013 at the Ashland Place Hotel.  She gets -- the

12   defendant's boss, after repeatedly saying, "I'm going fire you,

13   I'm going to fire you," sends a Post-it note -- and we have the

14   Post-it note.  So there's really no doubt of that.  That's

15   physical evidence.  So what we have here is --

16           Thank you.

17           -- physical evidence that she asked for it.  Well,

18   Greg, why is that different than other people?  That's a good

19   question.  If you go and look at Government's Exhibit No. 45,

20   there's a listing of everyone that contributed.  Do you see --

21   one name you do not see?  Victor Crawford.  Why?  She knows

22   it's illegal.  She knows she's threatened him.  It's exact

23   proof of her intent.  And where was this found?  On her desk.

24           But if that's not enough, we went to the independent

25   records of Ashland Hotel & Suites, and they actually kept track
```

1    of everyone that donated.  You'll see every check on there.

2    But you know whose name you will not see?  Victor Crawford's.

3    A concerted effort to hide what she has extorted from her

4    employee.

5         You have the intent because she knows it's wrong.

6    You have the continual threats you know that's wrong.  You have

7    the list that shows that what she's asking for and then proof

8    off her desk and from an independent third party that she hid

9    that.  Hiding something shows guilt.

10        Now, we'll talk about that.  Does Victor Crawford

11   collaborate with Chad Tucker?  Now, when the defendant was

12   interviewed by Mr. Ketrick Kelley, the response was not in the

13   newspaper part, but he, Victor, does on the Web site.  He does

14   help with some of the Web site stuff and does do some social

15   media.

16        Wes Gunter said he didn't even know who he was.  He

17   bills him in February and March and has never even seen the

18   person.  He doesn't even know him.  Chad Tucker says I had one

19   meeting in 2012.  That's it.  Chad Tucker or Victor says that

20   Chad Tucker says that, and Wes Gunter says that.

21        So, now, if you just thought, all right, I'm not

22   going to listen to what Victor Crawford says -- and I'll touch

23   base on Mr. Knizley's shenanigans, but if we looked at Chad

24   Tucker, he agrees with it.  And then Wes Gunter agrees with it,

25   and, in fact, there's no evidence of that.  That's another lie.

1566

1    Information in the newsletter was incorrect as Chad

2  Tucker's ad agency did it and sent it out before my office even

3  proofed it.

4    Do you remember Marilyn Wood coming in?  And she sent

5  that E-mail.  Because when that first newsletter went out to

6  support her plan to do these bills, guess what?  She didn't

7  check with Chad Tucker.  So what does this fish that's losing

8  all her scales do?  She lies.  She throws Chad Tucker under the

9  bus and says, look, I didn't do that.

10    Now, we know that because we have the E-mail.  I

11  didn't even look at that.  We know that's false because Chad

12  Tucker and Wes Gunter said that they worked on it.  And from

13  the defendant's own desk, we found the iterations of numerous

14  copies of it where she changes it and changed it and changed

15  it.

16    Now, why lie about that?  Because she's a political

17  animal that's only concerned about her.  Let's go to this.

18  John Gray was entirely uncompensated.  That's the Lagniappe.

19  She got called by the Lagniappe.  And when she was asked, what

20  did she say?  John Gray was uncompensated.  We know that's a

21  lie because we have the check, and John Gray actually came in

22  and said that.  Why did she lie?  It's a consistent pattern of

23  driving her political ambition down.  She doesn't want it to

24  get out.

25    So she calls Chad Tucker.  What does Chad Tucker say?

1    She called me and said she lied.  I said, "Don't do that."  I

2    said, "Call them back."  Does she call back and say "I lied?"

3    No, no.  She calls back and says, "I wouldn't intentionally not

4    tell you the truth.  I just forgot about it."  After she had

5    just called Chad Tucker and said she lied about it.  So she

6    lies again about the lie, the unmitigated gall.

7              And then Hastie explaining the allocation of the

8    $1.25 funds.  Asked by the F.B.I.  And what does she say?  It's

9    on 158E.  Well, it's structured for any needs that we have in

10   the License Commission.  I think it's very vague.

11             Whose bill was that, the E-mail that we entered in

12   there with Mr. Carl, the letter where she's proposing it and

13   she came to the County Commission.  And on it she says it's "my

14   bill."  Do you know why?  Because she considers it her money,

15   her office, her E-mails.  Why?  Because she's not a public

16   servant.  It's all about her and her political desires to move

17   this down the road.

18             So let's go to No. 8.  Submission of bill under

19   Bienville Rock, page 151C.  Submission of bill under Bienville

20   Rock.  I just did it because I didn't want to listen to

21   Merceria.  And then -- if they catch me, I will put it through

22   something else.  They did it last time, so I'm sure they will

23   this time.  Could there be any more proof of monkeying the

24   bills and submitting them under somebody else's name?

25             Think about this:  When I had Mr. Gunter on the

1    stand, he seemed like a relatively nice gentleman, but I

2    said -- he goes, "Well, I didn't care where the money came

3    from."  I said name one other time that you got a bill for work

4    you did and you admit you did no work for Victor Crawford or

5    Bienville Rock or APL that somebody called and told you to --

6    that someone else is going to pay.  What was his answer?  No.

7    Zero.

8            Then when they asked about 154B regarding the $1.25

9    revenue, remember when Victor Crawford said we are going to

10   repackage that tax so it doesn't look like it's so much so the

11   County Commission will pay for it?  Remember that?  And then a

12   little longer in the tape, then he says that we did this to

13   make it more palatable.

14           How do we know that's true?  We know this because on

15   154B, it says "and plus I don't want them thinking that way.

16   So I want them to see what -- only what I want them to see."

17   Is that how transparent government works?  Is that how a

18   politician --well, that's how a politician works.  How does a

19   public servant work because why does she do that?  Because she

20   views it as "her" office.  She's making "my" decisions.  It's

21   "her" E-mails.  Now, the contractor.

22           I'll finish this.  Question 10.  Did Hastie instruct

23   Victor Crawford to pad his bill for the Christmas present

24   expenditure?  No, he did not.  Now, we have two tapes on that,

25   158J and then the 149B.  The 149B Mr. Knizley played.

1    Listen -- go back and listen to this.  He comes into Ramona's

2    office and says, "Did I hear that right?  She wants me to pad

3    my bill for the overcharge."

4            Think about what Ms. Hastie said -- or Ramona Yeager

5    says.  "I didn't know that" or "that's crazy" or "why would

6    anyone pad their bill."  She says, "Have you done it?  Have you

7    done it?"

8            No. 11, did Crawford donate to a campaign for Revenue

9    Commissioner.  "I don't even remember if he did."  That was

10   Ketrick Kelley walking in and asking her.

11           Now, we've got in the records when she was running

12   for her campaign here, she had $196 in her account.  $196.

13   Guess how many contributions she got in 2014?  One.  One for

14   $1800, that she hit up her employee for, in violation of state

15   ethics, intimidating him to turn over.  She didn't even have

16   the gall to pay her own filing fee.  She wants to be the

17   Revenue Commissioner, and she hits her employee and contractor

18   up with a filing fee.

19           Now, let's talk a little bit about Victor Crawford.

20   Now, it's easy to yell and scream at somebody really loud and

21   call him a liar, but when Victor Crawford was on the stand, two

22   things I noticed happened that were super, super interesting.

23           One, the defense counsel handed him a bill with three

24   or four pages, and it had an invoice for Wakefly.

25           Can you put the Wakefly thing on?

1    Now, you'll see there how it's supposed to work.

2   Bienville Rock has a contract with Wakefly and pays them

3   because they are the contractor for them.  So instead of just

4   doing the honest thing and handing him the whole bill, what

5   does Mr. Knizley do?  He takes just a couple pages in there to

6   make it look like the only thing that came from Wakefly was

7   this one invoice -- "that's just like Strateco."  How long does

8   it take just to pull out the entire contract?  All of about

9   five minutes.

10    I don't mind hard cross-examination because, to me,

11  it's kind of the crucible that you make people go through to

12  see if they are telling the truth.  But fixing a document?  Do

13  we really have to do that?  It seems that's kind of the Hastie

14  way, the Hastie and Ramona Yeager way.

15    So then he goes and talks about cherry-picking a

16  document.  Defense counsel wants to yell and scream.  He takes

17  one document out of the divorce filing five years ago, one

18  page, and he screams and yells.  Screams and yells, "You're

19  lying.  You're lying.  You're lying."

20    So what did I ask Victor Crawford to do?  Bring your

21  tax returns in.  He brings in his 2010 tax returns, personal

22  and his corporate, which really puts to bed this whole thing

23  that he's, like, stealing money from the Government.  It

24  matches exactly what is on here.  Exactly.

25    And then if you look at the bottom of the order, it

1    says and return the rest of your tax return.  And, through his

2    attorney, he presented his 2008, 2009, and 2010 tax returns.

3    They have -- the Court has all the tax returns.

4            Well, why was Mr. Knizley just showing you this one

5    page?  Because it's the Hastie way.  It's the tricky way.  It's

6    the way to just pick and choose what you want somebody to see.

7            Then to allege that --

8            Could you put this on the -- or you can just put them

9    in front of them.

10            Defense counsel went back and cherry-picked January,

11    February, March, and April of the bills of Victor Crawford

12    because, remember, they want to say Ramona Yeager doesn't have

13    anything to do with this.  Except, if you look at the contract,

14    she actually gets all the assignments, and she checks and

15    signed off on them.

16            In March of 2015, she found one mistake.  Do you

17    remember that?  House broke in.  He said he worked at home, and

18    she said he didn't.  We'll take it off.  Yell and scream.

19    That's a lot of hooey.

20            And you can take and look at all the contracts, but I

21    looked at January for the work entries and the pages.  And out

22    of those one, two, three, four, five months, there's

23    258 entries, 80 pages.  If you extrapolated that times 12,

24    times 52, times 7 years, there's 4,368 entries in his work

25    that's all been turned over from him.  Out of that they found

```
 1    one error from the Mobile County License Commission.  That's an

 2    error rate of .00022.  Now, did it really take all that

 3    screaming to get that out or maybe that's just another way of

 4    the Hastie way of doing things.

 5           This is a little chart that I made up that shows how

 6    the contracting system is supposed to work.  Mobile County has

 7    employees, and Strateco had employees.  And then there's

 8    Bienville Rock.  She didn't want to pay Strateco.  She wanted

 9    to hide that from Mobile County.

10           Now, I don't know if Mobile County would agree with

11    that or not, but the very first step is you've got to get a

12    contract.  It's got to go over there.  The attorney has got to

13    look at it, and the Commission has to vote on it.

14           Why is that important?  Because that's y'all's tax

15    dollars.  And those meetings are all open.  So you could go

16    there and say, "I don't really think it's right that the

17    taxpayers should pay for her desire to merge these offices so

18    she can get this big contract"; or everyone could vote that

19    it's true.

20           But the Hastie way is to lie.  And she specifically

21    listed, "I don't want Merceria knowing that."  Merceria Ludgood

22    is the County Commissioner.  The County Commission doesn't even

23    get the bills.  I mean, they could yell and scream about the

24    County Commission, but the County Commission doesn't even get

25    the bills.  The person that gets the bills and reviews them was
```

1   on the stand, Michelle Herman.  She reviews them, and who does

2   she rely on?  Those two defendants right there.  They both sign

3   those and submit them knowing that they are fooling Mobile

4   County to think that's a legitimate expense that Bienville Rock

5   had when, in reality, it's her expense.

6           And then if you look at -- what's interesting about

7   this is you look at February 2014, Wes Gunter, Chad Tucker,

8   everyone agreed, the campaign merger, did all of the work in

9   February.  There is no newsletter.  There is nothing but her

10  political desire.

11          Then March 2014, they do no work.  I'm not really

12  sure how that works for the taxpayer, that we are paying

13  someone that does no work.

14          And then in April 2014, they start on the newsletter,

15  but what is the purpose of the newsletter?  The purpose of the

16  newsletter -- and you'll see the exhibits -- is to turn public

17  opinion to vote for the bill that she wants.

18          It, obviously, wasn't a very good bill because they

19  keep yelling about it, but it didn't even get out of committee.

20  No.  People looked at it like, no, we are not going to combine

21  these offices and give her a big raise.  Look at the bill on

22  her desk.  You don't have to listen to me.  Look at the bill.

23          But that's not enough.  She wants John Gray, her

24  political consultant --

25          Can you put -- do you have the John Gray invoice?

1          John Gray tried to say he is not a political

2     consultant.  Look at the invoices.  Look at what he charged.

3     $10,000 not to me.  Right here, it says Mobile County combined

4     office cost reduction legislative strategy, communications,

5     consulting, management of bill drafting.

6          Remember he said I didn't work on the bill drafting.

7     That's a lie.  Meeting with legislators.  I didn't meet with

8     legislators.  Well, he says he did.  That's a lie.

9     Coordination with political efforts.  I thought this wasn't a

10    political effort.  Another Hastie lie.  Review of research and

11    delivery of legislation for introduction.  I thought he didn't

12    go up there and talk to them.

13         John Gray is a little hack that she paid to come in

14    here and lie about what she thought.  Okay?  John Gray kept

15    saying, well, Hastie said this, Hastie thought this, Hastie

16    thought this.  That's not his job.  We know that's a lie.

17    That's why we put Jerry Carl up to say that it was her bill,

18    she pushed the legislation.

19         So she lied to John Gray when she got caught, and she

20    lied to the F.B.I. when she got caught.  Look at that bill.

21    It's very vague.  I can spend it on anything I want to.

22    Another Hastie way to lie.  There's Exhibit No. 51.  That's her

23    bill.  Her money.

24         Now, we have a summary of what money was spent out of

25    there.  Take a look at it.  Best Buy, a sundry of other things,

1   and then a political consultant out of it.  No kiosks.  None of

2   this great stuff they were going to spend it on.  $800,000 of

3   taxpayer money that she has sole control over and nobody is

4   reviewing.  That's because they are her consultants.  Her

5   consultants.

6          The problem with that is, is the taxpayers of Mobile

7   are paying for it.  This case is really not so much about

8   stealing money.  It's really more about stealing freedom.  What

9   do you mean by that, Greg?  I will agree with defense counsel

10  on the founding of this country, but what started the whole

11  thing?  Taxation without representation.  The people should

12  know.  The people should vote.  That's the way it's supposed to

13  work.  And that's why Mobile County set up a system that you

14  can't hire somebody unless you have a contract.  And that

15  contract says she can tell Victor what she needs, and then

16  Victor goes and does -- hires a person.

17         Why is that?  If you go to -- it's on two -- defense

18  counsel only showed you paragraph 2.  Look at 2 and then 4 and

19  then go back to 9.  And the reason that paragraph 9 is so

20  important is why I went over it is Mobile County set a fixed

21  rate of $150 and $75.  They incur no additional costs.

22         Now, if you get your check, if it's anything like

23  mine, Uncle Sam gets a big chunk.  That's the way it is.  But

24  my employer pays a bunch, too -- Social Security, health

25  insurance.  I disagree with Katie.  She was provided health

1   insurance, unemployment insurance.  All these costs go up.

2              So it would be like over at Austal.  Austal sets a

3   price for the ship.  We are going to build a ship.  Now, do you

4   think Austal is going to charge the same amount to the United

5   States to the welder?  They are paying him $15 an hour.  No,

6   they would be out of business because they have to figure in

7   all the additional costs, plus make a profit, plus get the ship

8   built.

9              But what Mobile County does with its contract is they

10  absolve themself from that and they only have a fixed cost.  So

11  you know and you even hear it on the tape -- defense counsel

12  just played it.  She says are you going to -- "Victor, we are

13  busy.  Are you gonna hire some help?"  She doesn't say, "I'm

14  going to hire them."  She says, "Are you going to hire them?"

15             Why?  Because when he hires them, he bears total

16  responsibility for them.  And he's an at-will the employee.  So

17  he can be fired at any time.  Any time.  So he has to accept

18  all the risk.  And then the other thing about Katie Williamson,

19  he stole this money.  Well, they haven't shown one false

20  billing.  Katie Williamson came in, and I asked her, "The

21  training that you gave, was it useful?"

22             "Yes."

23             "Was it useful?"

24             "Yes."

25             "Did it help the Mobile County License Commission?"

1        "Yes."

2             So what defense counsel wants to do on one hand is

3   say he's a liar and a cheater and a crook.  That's Mr. Knizley.

4   And, on the other hand, they want to say he's a great guy and

5   that she wanted to keep him.  You can't have your cake and eat

6   it too.

7             In 2013 defendant wrote that letter of recommendation

8   because Victor Crawford was doing a good job.  He designed the

9   10-Minute Tags program, and he was doing a good job.

10            But back in 2009 something happened.  Right here.

11  This is the beginning of her turning bad.  She extorts in 2010,

12  2011.  And why is Mobi-Media on here important?  One, it shows

13  defense counsel it was a bunch of hooey that they did all this

14  computer work.  It's kind of a test run.  Can we run this

15  through and lie about who actually did it and make the County

16  pay for it.  It's not a charged count, but it's in the

17  indictment.  So you can see how it goes.

18            But that leads to 2012.  We have the invoices as 43.

19  And then we get to the House Bill 117, the $1.25 fund.  Why is

20  this important?  It's another lie.  Remember when Chad Tucker

21  called Hastie and said, "Well, why did you pay John Gray and

22  then pay me through a third party that I don't even know."

23            And she says, "I didn't have the $1.25 fund at that

24  time."  That is a lie.  Here it is.  Right here.  So when she

25  gets caught here and she pays Strategy from 2013 at six months

1    later, so when she's caught and Chad Tucker asks her about it,

2    what does she do?  She defaults to the Hastie way, the lying

3    way.  So they start lying.

4           Then the $1800 on the campaign checks.  This is key

5    because the very first thing that they do is the merger of the

6    offices, and they met with everybody over there.  And if you go

7    back and you'll listen to the tapes, you'll hear Ramona Yeager

8    agreeing and changing the bills.

9           Now, I agree she was not the quarterback of the team,

10   but as the judge is going to instruct you, a conspiracy is a

11   group.  Some of you are the quarterback.  Some people are the

12   center.  Some people are the linemen.  Some people are the

13   linebacker.  It takes all kinds.

14          As you go through those counts -- every E-mail was

15   entered into evidence.  Every mailing was entered in evidence.

16   Why is that important?  The judge is going to instruct you that

17   you don't have to find that that specific E-mail caused

18   something.  It's only that during the course of the conspiracy

19   that the E-mail went.  It's uncontested that it went across

20   interstate lines.  That was a stipulated point.  And that there

21   was a mailing.

22          So, right here, where it's the Kim Hastie retainer,

23   when the two of them sign off on this, just that alone, they

24   are guilty of Count 1.

25          Now, you may say, "Greg, well, there's a number of

1   iterations of that bill."  Yes, but you'll notice one thing.

2   As it got -- as the iterations changed, what one thing did not

3   change, one thing that Hastie and Ramona Yeager wanted to make

4   sure?  That Bienville Rock was on there.  That is false.  That

5   is the impetus of the whole case that Bienville Rock did --

6   Bienville Rock incurred those expenses when they knew it was

7   false, and they did not incur those expenses.

8            Ramona Yeager is the one that checks it.  She's

9   supposed to check the expenses.  What I find so interesting, as

10  you listen to these tapes, Victor comes in and he says well,

11  what should I put on the bill, what are they doing --

12            THE CLERK:  Mr. Bordenkircher, two minutes.

13            THE COURT:  Two minutes.

14            MR. BORDENKIRCHER:  What are they doing?  If he was

15  doing the work, would they know what he was doing?  Of course,

16  he would.  My grandma used to say common sense is like horse

17  sense, and you don't want to lose that at the door when you go

18  back.

19            But I do want you to go back there and listen to all

20  the evidence and look at the contracts and look at the

21  variations of the bill, bill, bill, bill and who ends up paying

22  for it.  And that's really the -- what this case is about.

23            As she runs through all these lies and -- you know,

24  what we just talked about with Chad Tucker.  Excuse me for not

25  having that on there.  Twelve demonstrable lies from this

1  public servant.  But that's the problem.  She considers

2  everything hers, and she says that it's my sand box.  It's all

3  about me.

4          Well, as Moses said, when it's all about you, things

5  go bad.  And isn't that what the problem we're having right now

6  with this?  It's not all about her.  It's not her money.  The

7  $1.25 is not her money.  It's y'all's money.  That's the

8  problem.

9          And when she changes the bill and hides it, she just

10 doesn't steal money, $10,000, $20,000, $50,000, who cares.

11 What this case is about is about the principle of who can

12 decide.  Can you trick your way and lay your way for your

13 political campaign and the taxpayers not know.

14          That's the Hastie way.  The American way and the

15 right way that's set up by Mobile County is all these have to

16 be examined and then we can decide, the people can decide, if

17 they want to do this.  What you've been robbed of and the

18 people of Mobile County has been robbed of is that you can't

19 get back -- you can make more money -- is the loss of freedom,

20 a loss of freedom in deciding can you say yes or no or does a

21 lying politician get on T.V. and lie repeatedly and get away

22 with it.

23          The evidence in this case is going to say no.  You

24 can't get on T.V. and lie about it.  You can't take people's

25 E-mails.  You can't rig bills.  You can't feather your

1  political nest for your own good.  If she'd done the

2  information thing and asked the county if she could do this, we

3  wouldn't have a person --

4          THE COURT:  Mr. Bordenkircher, you have two minutes

5  to wrap it up.

6          MR. BORDENKIRCHER:  Thank you.

7          -- we wouldn't be here, but she has robbed us of

8  that.  She has robbed the taxpayers of the decision -- whether

9  I want to put out a pamphlet or not, of whether I want to pay

10 for a political consultant.

11         A hired gun, like Mr. Gray, that comes in here and on

12 his own bill lies to y'all.  His own written bill, he says this

13 is why he did -- no, I didn't, I didn't write the bill.  I

14 didn't do any legislation and then to try to turn it around on

15 the victim and make up stuff about his divorce and make up

16 stuff about his bad billing.

17         If anyone questioned him, he paid the money back.

18 But to sit here and make the victim the bad guy when she took

19 an oath of office to be our public servant, not her own.  It's

20 not to be first, and everyone else is last.  To be first, you

21 must be last.  When you look at all the evidence, you are going

22 to know that this is a politician and her assistant that have

23 gone bad for their own political desires.  Thank you.

24         THE COURT:  All right.  The instructions that I gave

25 you at the beginning of the case, if you'll pass those to your

1    left.

2            You can pick those up, Melanie.

3            And Ms. Barnes is passing out the final instructions,

4    which is a complete set of the instructions.  I just want to

5    make sure that you don't get them mixed up.  They are almost

6    identical, but this one includes some additional instructions.

7            All right.  I'm going to read these to you, as I'm

8    required to do, if you'll please follow along.

9            It's now my duty to instruct you on the rules of law

10   that you must follow and apply in deciding this case.  When I

11   have finished, you will go to the jury room and begin your

12   discussions, what we call deliberations.

13           You must decide whether the Government has proved the

14   specific facts necessary to find the defendants guilty beyond a

15   reasonable doubt.  Your decision must be based only on the

16   evidence presented here.  You must not be influenced in any way

17   by either sympathy for or prejudice against the defendants or

18   the Government.  Our system of justice is counting on you to

19   render a fair decision based on the evidence, not based on

20   feelings, prejudices, fears, or stereotypes.

21           You must follow the law as I explain it.  Even if you

22   do not agree with the law, you must follow all of my

23   instructions as a whole.  You must not single out or disregard

24   any of the Court's instructions on the law.

25           The indictment, or formal charge against the

1    defendant, isn't evidence of guilt.  The law presumes every

2    defendant is innocent.  The defendant does not have to prove

3    her innocence or produce any evidence at all.  A defendant does

4    not have to testify.

5         In this case the defendants chose not to testify, and

6    you cannot consider this in any way while making your decision.

7         The Government must prove guilt beyond a reasonable

8    doubt.  If it fails to do so, you must find the defendant not

9    guilty.  The Government's proof, burden of proof, is heavy, but

10   it doesn't have to prove a defendant's guilt beyond all

11   possible doubt.  The Government's proof only has to exclude any

12   reasonable doubt concerning a defendant's guilt.

13        A reasonable doubt is a real doubt based on your

14   reason and common sense after you've carefully and impartially

15   considered all the evidence in the case.

16        Proof beyond a reasonable doubt is proof so

17   convincing that you would be willing to rely and act on it

18   without hesitation in the most important of your own affairs.

19        If you are convinced that the defendant has been

20   proved guilty beyond a reasonable doubt, say so.  If you are

21   not convinced, say so.

22        As I said before, you must only consider the evidence

23   that I have admitted in this case.  Evidence includes the

24   testimony of witnesses and exhibits admitted as well as any

25   stipulations or agreed facts, but anything the lawyers say is

1    not evidence and isn't binding on you.

2              Now, you shouldn't assume from anything I have said

3    that I have any opinion about the factual issues in this case.

4    Except for my instructions to you on the law, you should

5    disregard anything I may have said during the trial in arriving

6    at your decision about the facts.  It's your own recollection

7    and interpretation of the evidence is what matters.

8              Now, in considering the evidence, you may use

9    reasoning and common sense to make deductions and reach

10   conclusions.  You shouldn't be concerned about whether the

11   evidence is direct or circumstantial.

12             Direct evidence is the testimony of a person who

13   asserts that he or she has actual knowledge of a fact, such as

14   an eyewitness.

15             Circumstantial evidence is proof of a chain of facts

16   and circumstances that tend to prove or disprove a fact.

17             There's no legal difference in the weight you may

18   give to either direct or circumstantial evidence.

19             When I say you must consider all the evidence, I

20   don't mean that you must accept all the evidence as true or

21   accurate.  You should decide whether you believe what each

22   witness had to say and how important that testimony was.  In

23   making that decision, you may believe or disbelieve any witness

24   in whole or in part.

25             The number of witnesses testifying concerning a

1   particular point doesn't necessarily matter.

2            To decide whether you believe any witness, I suggest

3   you ask yourself a few questions:

4            Did the witness impress you as one who was telling

5   the truth?

6            Did the witness have any particular reason not to

7   tell the truth?

8            Did the witness have a personal interest in the

9   outcome of the case?

10           Did the witness seem to have a good memory?

11           Did the witness have the opportunity and the ability

12  to accurately observe the things he or she testified about?

13           Did the witness appear to understand the questions

14  clearly and answer them directly?

15           Did the witness's testimony differ from other

16  testimony or other evidences?

17           You should also ask yourself whether there was

18  evidence that a witness testified falsely about an important

19  fact.  And ask whether there was evidence that at some other

20  time a witness said or did something or didn't say or do

21  something that was different from the testimony the witness

22  gave during the trial.

23           But keep in mind that a simple mistake doesn't mean a

24  witness wasn't telling the truth as he or she remembers it.

25  People naturally tend to forget some things or remember them

1    inaccurately.  So if a witness misstated something, you must

2    decide whether it was because of an innocent lapse in memory or

3    an intentional deception.

4           The significance of your decision may depend on

5    whether the misstatement is about an important fact or an

6    unimportant detail.

7           Evidence of a defendant's character traits may create

8    a reasonable doubt.  You should consider the testimony that a

9    defendant is an honest and law-abiding citizen, along with all

10   the other evidence, to decide whether the Government has proved

11   beyond a reasonable doubt that the defendant committed the

12   offense.

13          I remind you that the law never imposed upon a

14   criminal defendant the duty to prove his or her innocence or

15   produce any evidence or testify at all.

16          Now, although the defendants are being tried

17   together, you must give separate consideration to each

18   defendant.  In doing so, you must determine which evidence in

19   the case applies to a particular defendant and disregard any

20   evidence admitted solely against some other defendant.  The

21   fact that you find one of the defendants guilty or not guilty

22   should not control your verdict as to the other defendant.

23          Now, the indictment charges 17 total counts.  They

24   are now -- there are nine counts against both defendants and

25   then eight counts against only Kim Hastie.  You'll be given a

1   copy of the indictment to refer to during your deliberations.

2           Now, Count 1 is the conspiracy count.  Count 1

3   charges Kimberly Hastie and Ramona Yeager with conspiring to

4   commit wire fraud and mail fraud.

5           It is a federal crime to knowingly and willfully

6   conspire or agree with someone to do something that, if

7   actually carried out, would result in the crime of wire fraud

8   or mail fraud.

9           A conspiracy is an agreement by two or more persons

10  to commit an unlawful act.  In other words, it's the kind of

11  partnership for criminal purpose.  Every member of the

12  conspiracy becomes the agent or partner of every other member.

13          The word "knowingly" means an act was done

14  voluntarily and intentionally and not by mistake or accident.

15          The word "willfully" means the act was committed

16  voluntarily and purposely with the intent to do something the

17  law forbids; that is, with the bad purpose to disobey or

18  disregard the law.

19          Now, while a person must have acted with the intent

20  to do something the law forbids, before you can find that

21  person acted willfully, the person need not be aware of the

22  specific law or rule that his or her conduct may be violating.

23          The Government does not have to prove that members of

24  the conspiracy made any kind of formal agreement.  Also,

25  because the heart of the conspiracy is the making of the

1    unlawful plan itself, the Government does not have to prove

2    that the conspiracy succeeded in carrying out the plan.

3           Now, for each one of these counts, I've gone through

4    and I've given you and I've numbered them, Element 1,

5    Element 2.  And I suggest that when you go back, you consider

6    each count separately for each defendant separately that you

7    look at these counts, and when you determine that the

8    Government has proven it beyond a reasonable doubt, you put a

9    checkmark beside it.  That way, you know that you've considered

10   what each element is of each count.

11          So let's start with the first one.  A defendant can

12   be found guilty of this conspiracy offense only if all the

13   following facts are proved beyond a reasonable doubt:

14          Two or more persons in some way or manner agree to

15   try to accomplish a common and unlawful plan to commit wire

16   fraud or mail fraud, as charged in the indictment; and the

17   defendant knew the unlawful purpose of the plan and willfully

18   joined in it.

19          A person may be a conspirator even without knowing

20   all the details of the unlawful plan or the names and

21   identities of all the other alleged conspirators.

22          If the defendant played only a minor part in the plan

23   but had a general understanding of the unlawful purpose of the

24   plan and willfully joined in the plan on at least one occasion,

25   that is sufficient for you to find the defendant guilty.  But

1   simply being present at the scene of an event or merely

2   associating with certain people and discussing common goals and

3   interests doesn't establish proof of a conspiracy.

4          Also, a person who doesn't know about a conspiracy

5   but happens to act in a way that advances some purpose of one

6   doesn't automatically become a conspirator.  In this case

7   regarding the alleged conspiracy, the indictment charges that

8   the defendants conspired to commit wire fraud and mail fraud,

9   in other words, the defendants are charged with conspiring to

10  commit two separate substantive crimes.

11         Now, the Government does not have to prove that the

12  defendant willfully conspired to commit both crimes.  It is

13  sufficient if the Government proves beyond a reasonable doubt

14  that the defendant willfully conspired to commit one of those

15  crimes.  But to return a verdict of guilty, you must all agree

16  on which of the two crimes the defendant conspired to commit.

17         Now, Counts 2 through 6 charge the wire fraud.  It's

18  a federal crime to use interstate wire, radio, or television

19  communications to carry out a scheme to defraud someone else.

20         The defendants can be found guilty of this crime only

21  if all the following facts are proved beyond a reasonable

22  doubt:

23         The defendant knowingly devised or participated in a

24  scheme to defraud or obtain money or property using false

25  pretenses, representations, or promises; the false pretenses,

1    representations, or promises were about a material fact; the

2    defendant acted with the intent to defraud; and the defendant

3    transmitted or caused to be transmitted by a wire some

4    communication in interstate commerce to help carry out the

5    scheme to defraud.

6             The Government does not have to prove all the details

7    alleged in the indictment about the precise nature and purpose

8    of the scheme.  It also doesn't have to prove that the material

9    transmitted by interstate wire was itself false or fraudulent

10   or that the using of the wire was intended as a specific or

11   exclusive means of carrying out the alleged fraud or that the

12   defendant personally made the transmission over the wire, and

13   it doesn't have to prove that the alleged scheme actually

14   succeeded in defrauding anyone.

15            Now, to use interstate wire communications is to act

16   as -- to act so that something would normally be sent through a

17   wire during the normal course of business.  Each separate use

18   of interstate wire communication is part of the scheme to

19   defraud is a separate crime.

20            Now, Count 7 through 9 charge the mail fraud.  It's a

21   federal crime to use the United States mail in carrying out a

22   scheme to defraud someone.

23            The defendant can be found guilty of this crime only

24   if all the following facts are proved beyond a reasonable

25   doubt:

1    The defendant knowingly devised or participated in a

2    scheme to defraud someone or obtain money or property using

3    false or fraudulent pretenses, representations, or promises;

4    the false or fraudulent pretenses, representations, or promises

5    were about a material fact; the defendant intended to defraud

6    someone; and the defendant used the United States Postal

7    Service by mailing or causing to be mailed something helped to

8    carry out the scheme to defraud.

9    Now, the Government does not have to prove all the

10   details about the precise nature and purpose of the scheme or

11   that the material mailed was itself false or fraudulent.  It

12   also does not have to prove that the use of the mail was

13   intended as the specific or exclusive means of carrying out the

14   fraud or that the defendant actually did the mailing.  It

15   doesn't even have to prove that anyone was actually defrauded.

16   To cause the mail to be used is to do an act that the

17   use of mail will usually follow in the ordinary course of

18   business or where that use can reasonably be foreseen.

19   Now, each separate use of the mail as part of the

20   scheme to defraud is a separate crime.

21   As used in the mail fraud and the wire fraud counts,

22   the term "scheme to defraud" includes any plan or force of

23   action intended to deceive or cheat someone out of money or

24   property using false or fraudulent pretenses, representations,

25   or promises.

1    As used in Counts 2 through 9, a statement or

2   representation is false or fraudulent if it is about a material

3   fact.  It is made with the intent to defraud and the speaker

4   either knows it is untrue or makes it with reckless

5   indifference to the truth.

6    It may be false or fraudulent if it is made with

7   intent to defraud and is a half-truth or effectively conceals a

8   material fact.  As used in the wire fraud and mail fraud

9   counts, a material fact is an important fact that a reasonable

10  person would use to decide whether to do or not do something.

11    A fact is material if it has the capacity or natural

12  tendency to influence a person's decision.  It doesn't matter

13  whether the decision-maker actually relied on the statement or

14  knew or should have known that the statement was false.

15    And, as used in Counts 2 through 9, to act with

16  intent to defraud means to act knowingly and with the specific

17  intent to deceive or cheat someone, usually for personal gain

18  or to cause financial loss to someone else.

19    Now, it's very important to remember that the

20  defendants are not on trial for violation of state ethics laws.

21  You are not to decide whether the defendants violated any state

22  law.  Rather, you may consider those ethics laws only to extent

23  that any possible violation or violations may be evidence of an

24  intent to commit the charged mail or wire fraud.

25    Violations of state ethics laws, standing alone, do

1    not prove that the defendant committed fraud.

2              Now, Counts 10 through 15, extortion, are charged

3    against Defendant Kimberly Hastie in violation of the Hobbs

4    Act.  Page 13.  It's a federal crime to extort something from

5    someone else and in doing so to obstruct, delay, or affect

6    interstate commerce.

7              The defendant can be found guilty of this crime only

8    if all of the facts -- following facts are proved beyond a

9    reasonable doubt:

10             That the defendant caused Victor Crawford to part

11   with property; the defendant did so knowingly by using

12   extortion under color of official right; and the extortionate

13   transaction delayed, interrupted, or affected interstate

14   commerce.

15             Property includes money and other tangible things of

16   value.

17             Interstate commerce is the flow of business

18   activities between one state and anywhere outside of that

19   state.

20             The Government doesn't have to prove that the

21   defendant specifically intended to affect interstate commerce

22   in any way, but it must prove that the natural consequences of

23   the acts described in the indictment would be to somehow delay,

24   interrupt, or affect interstate commerce.  If you decide that

25   there would be any effect on interstate commerce, then that is

1   enough to satisfy this element.  The effect can be minimal.

2          Extortion under color of official right is the

3   wrongful taking or receipt of money or property by a public

4   officer who knows that the money or property was taken or

5   received in return for doing or not doing official acts.

6          An explicit promise by a public official to act or

7   not act is an essential element that the Government must prove

8   beyond a reasonable doubt in order for you to find the

9   defendant guilty of extortion.

10          In other words, to find Hastie guilty of extortion,

11   you must find beyond a reasonable doubt that Hastie agreed to

12   take or forego some specific action in return for the specific

13   property described in each count.  However, an explicit promise

14   or solicitation need not be expressed.  An explicit agreement

15   may be implied for Hastie's words and actions, but a

16   generalized expectation of some future favorable action is not

17   sufficient to establish the extortion charge.

18          To summarize, in order to find Kimberly Hastie guilty

19   of extortion under a color of official right, as charged in

20   Counts 10 through 15, you must find beyond a reasonable doubt

21   that Hastie made an explicit promise to Victor Crawford to act

22   or not act in exchange for each of the following:

23          Count 10, a 42-inch Vizio television;

24          Count 11, a 40-inch television;

25          Count 12, a Kindle Fire and a 39-inch television;

1           Count 13, a Kindle Fire;

2           Count 14, a 37-inch television and an iPad;

3           And then Count 15, an $1800 campaign contribution.

4           Now, false statement to a federal agency.  Count 16

5    charges Kimberly Hastie with making a false statement to a

6    federal agency.  It is a federal crime to willfully make a

7    false or fraudulent statement to a department or agency of the

8    United States.

9           The defendant can be found guilty of this crime only

10   if all of the following facts are proved beyond a reasonable

11   doubt:

12          The defendant made the statement as charged in

13   Count 16 of the indictment; the statement was false; the

14   falsity concerned a material matter; the defendant acted

15   willfully, knowing that the statement was false; and the false

16   statement was made or used for a matter within the jurisdiction

17   of a department or agency of the United States.

18          A statement is false when made if it is untrue when

19   made and the person knows -- making it knows it is untrue.

20          The Government doesn't have to show that the

21   government agency or department was, in fact, deceived or

22   misled.

23          The making of a false statement is not a crime unless

24   the falsity relates to a material fact.  A material fact is an

25   important fact, not some unimportant or trivial detail, that

1   has the natural tendency to influence or is capable of

2   influencing a decision of a department or agency in reaching a

3   required decision.

4           Now, Count 17, the release of information from a

5   state Department of Motor Vehicles for an unauthorized purpose.

6   This count charges Kimberly Hastie with releasing information

7   from a state Department of Motor Vehicles for an unauthorized

8   purpose.  It is a federal crime for certain persons to

9   knowingly disclose an individual's personal information in

10   connection with a motor vehicle record unless the information

11   is released for a specifically authorized purpose.

12           The defendant can be found guilty of this crime only

13   if all of the following facts are proved beyond a reasonable

14   doubt:

15           The defendant is an officer, employee, or contractor

16   of a state department of motor vehicles; the defendant

17   knowingly disclosed or otherwise made available to any person

18   or entity personal information about an individual; the

19   personal information was obtained by the Department of Motor

20   Vehicles in connection with a motor vehicle record; and the

21   personal information was disclosed for any reason other than a

22   reason where the release of such information is specifically

23   permitted.

24           The term "personal information" means information

25   that identifies an individual, including an individual's E-mail

1    address, photographs, Social Security number, driver's license,

2    name, address, telephone number, medical or disability

3    information.

4            Personal information does not include information on

5    vehicular accidents, driving violations, and a driver's status.

6            The term "motor vehicle record" means any record that

7    pertains to a motor vehicle operator's permit, motor vehicle

8    title, motor vehicle registration or identification card issued

9    by Department of Motor Vehicles.

10           Now, each count of the indictment charges a separate

11   crime against one or more defendants.  You must consider the

12   case of each defendant and the evidence related to it

13   separately and individually.  If you find one defendant guilty,

14   that must not affect your verdict for any other defendant.

15           Now, I caution you that the defendant is on trial

16   only for the specific crime charged in the indictment.  You are

17   here to determine from the evidence in this case whether the

18   defendant is guilty or not guilty of that specific crime.

19           You must never consider punishment in any way to

20   decide whether a defendant is guilty.  If you find a defendant

21   guilty, the punishment is for me to decide later.

22           Now, your verdict, whether guilty or not, must be

23   unanimous.  In other words, you must all agree.

24           Your deliberations are secret, and you'll never have

25   to explain your verdict to anyone.  Each of you must decide the

```
 1    case for yourself but only after fully considering the evidence

 2    with the other jurors.  So you must discuss the case with one

 3    another and try to reach an agreement.

 4            While you are discussing the case, don't hesitate to

 5    reexamine your own opinion and change your mind if you become

 6    convinced that you are wrong, but don't give up your honest

 7    beliefs just because others think different or you simply want

 8    to get the case over with.  Remember that in a very real way

 9    you are the judges, judges of the facts.  Your only interest is

10    to seek the truth from the evidence in the case.

11            Now, you've been permitted to take notes during the

12    trial.  Most of you, perhaps all, have taken advantage of that.

13    If you have done so, you must use your notes only as a memory

14    aid during deliberations.  You must not give your notes

15    priority over your independent recollection of the evidence,

16    and you must not allow yourself to be unduly influenced by the

17    notes of others jurors.

18            And, besides that, notes are not entitled any greater

19    weight than your memories and impressions of the testimony.

20            Now, when you go to the jury room, the first thing

21    you need to do is elect a foreperson to speak on your behalf.

22    That foreperson will also direct your deliberations.

23            Now, I've prepared a verdict form.

24            Did each party receive a copy of the verdict form?

25            MR. KALAYOGLU:  Yes, Your Honor.
```

```
 1              THE COURT:  Before I -- is there any objection from
 2   the prosecution?
 3              MR. KALAYOGLU:  No, Your Honor.
 4              THE COURT:  And the defense?
 5              MR. KNIZLEY:  No, ma'am.
 6              MR. N. HANLEY:  No, ma'am.
 7              THE COURT:  Okay.  It's fairly self-explanatory, but
 8   I'll go over it with you.  It's simply, "We, the jury, find the
 9   defendant "-- in this instance -- "Kimberly Hastie guilty/not
10   guilty as charged in Count 1."  And I wrote by here
11   "conspiracy" to try to help you keep up with it.  And then wire
12   fraud, wire fraud, wire fraud, wire fraud, and then
13   three counts of mail fraud, extortion, extortion, extortion,
14   extortion, and then false statement, and, lastly, the
15   information release.  That's just to help you keep up with what
16   count you are referring to.
17              And, remember, each count must be considered
18   separately, and a vote must be taken as to each count.  When
19   you've all reached an agreement, your foreperson will either
20   check "guilty" or "not guilty."
21              The same for Ms. Yeager.  She has a separate verdict
22   form, a separate count -- excuse me -- a separate determination
23   for each count.
24              When you have completed this, you knock on the door,
25   and the CSO will come get me.  And we'll hear your verdict.
```

1    Now, if you have questions before then, I've prepared

2    what we call a "Note to the Court."  You tell me whether you've

3    reached a unanimous verdict, yes or no.  If it's no, don't tell

4    me the division in the room.  Then tell me what you need.

5    If you want to -- I'm going to give you a lunch break

6    before you come back to start deliberating.  If you want to

7    take an afternoon break, all you have to do there is just tell

8    the CSO "We're going to take an afternoon break.  We'll be back

9    at a certain time."

10    It is required that everybody be in the room when you

11    are deliberating.  So if somebody needs to take a break and,

12    you know, go downstairs and get a Coke or whatever, everybody

13    has to take a break.  You can't deliberate unless you are all

14    in the room at the same time.

15    Now, we have an alternate on this case, and it's

16    [redacted], [redacted].  Who is that?

17    That's you.  Okay.  I need you to go downstairs and

18    check out, but please do not discuss this case because if a

19    verdict is not reached today and they come back tomorrow to

20    continue deliberations, we have had situations where there was

21    an emergency for another juror and we've had to replace that

22    juror with an alternate.  Please do not discuss this case.

23    Remain untainted.  You can call at the end of the day tomorrow

24    and see if the case is over by that time.  Thank you for your

25    service.

1    Okay.  It is 12:20.  I ask that you be back in the

2  jury room -- is an hour sufficient?  Okay.  -- at 1:20.  And at

3  that time, then, the CSO will bring you all up, and you'll be

4  able to discuss the case then.

5    If you want to give your notebooks, if you want to

6  write on them so you make sure they are identified with your

7  name and when we come back, Ms. Barnes will give you your

8  notebooks back in the deliberation room.

9    Also, we will provide equipment for you if you would

10  like to listen to any of the CDs that have been played as

11  evidence in this case.

12    I will tell you a few things that I'm not able to

13  help you with.  Sometimes jurors would like to hear more

14  evidence.  The evidence is closed, and there will not be any

15  other evidence allowed.  I'm not allowed to comment on the

16  evidence at all.  And there will not be transcripts available.

17  So you'll have to rely on your collective memories.

18    All right.  Thank you very much.  If you'll take your

19  personal items with you, and give your notebooks to Ms. Barnes

20  as you leave.

21    Melanie, you want to collect them.

22    THE CLERK:  Yes, ma'am.

23    [Out of the presence of the jury in open court.]

24    THE COURT:  All right.  Any exceptions from the

25  Government as to the jury charges?

1    MR. BORDENKIRCHER:  No, Your Honor.

2    THE COURT:  And from Ms. Hastie?

3    MR. N. HANLEY:  None that weren't previously noted.

4    THE COURT:  Correct.

5    MR. KNIZLEY:  No, ma'am.

6    THE COURT:  Okay.  All right.  Well, you've heard the

7    instructions as far as when to be back and available.  We'll

8    see you then.  Thank you.

9        [Recess.]

10       [Jury deliberations commence.]

11       [Out of the presence of the jury in open court.]

12       THE COURT:  All right.  We have a question.  You may

13   be seated.  Ms. Barnes is passing out the question and my

14   proposed answer.

15       Mr. Bordenkircher, do you have an objection?

16       MR. BORDENKIRCHER:  No.

17       THE COURT:  Mr. Knizley?

18       MR. KNIZLEY:  No, ma'am.

19       THE COURT:  Mr. Hanley?

20       MR. N. HANLEY:  No, ma'am.

21       THE COURT:  All right.  For the record the jury

22   asked -- they say "charged" but they mean "convicted."  "Can we

23   convict one person with conspiracy and not the other?"

24       The answer is, "Yes, even if you find Defendant A not

25   guilty of conspiracy, Defendant B can be found guilty of

1  conspiracy, if you find that Defendant B agreed with another

2  person not named in the indictment to try to accomplish a

3  common and unlawful plan to commit wire fraud or mail fraud and

4  Defendant B knew the unlawful purpose of the plan and willfully

5  joined in it.  However, because the heart of a conspiracy is

6  the making of the unlawful plan itself, the unnamed person must

7  also have known the unlawful purpose of the plan and willfully

8  joined in it."

9          We'll give that to the jury.

10          THE CLERK:  Yes, ma'am.

11          THE COURT:  All right.  We'll call you if we hear

12  from them again.

13          MR. BORDENKIRCHER:  Thank you, your Honor.

14      [Jury deliberations continue with the court is in recess.]

15      [Chambers conference with Mr. Bordenkircher, Ms. Stewart,

16      Mr. Knizley, Mr. Darley, Mr. N. Hanley, and Mr. S. Hanley

17      present.  Also present are Courtroom Deputy Melanie Barnes

18      and Law Clerk Elizabeth Stepan.]

19          THE COURT:  Keep your seats.  Did you give them a

20  copy of the question?

21          THE CLERK:  I don't have the question.

22          MS. STEPAN:  Oh, I've got them in here.

23          THE COURT:  All right.  Well, you need the question.

24      [Pause in proceedings.]

25          THE COURT:  They are referencing page 16, I'm

```
1   assuming, because there's nowhere else I mention a state

2   employee.  So we need to know if there's a difference of an

3   employee from the State or the County from the DMV.  I propose

4   to say the License Commission is a state Department of Motor

5   Vehicles.

6           MR. BORDENKIRCHER:  That's correct.

7           MR. N. HANLEY:  I don't know it is.  May I go ask my

8   client?

9           THE COURT:  Go ahead.

10          MR. KNIZLEY:  No.  I don't have anything to do with

11  this question.

12          THE COURT:  Well, do you happen to know, as an

13  officer court --

14          MR. KNIZLEY:  I do not.

15          THE COURT:  -- that I'm incorrect?

16          MR. KNIZLEY:  Well, you know, the jury is gone, Your

17  Honor; is that correct?

18          THE COURT:  Yes.

19          MR. KNIZLEY:  I would think Mr. Hanley may want to

20  take a look themselves to see if that is a correct statement of

21  the law or not.

22          THE COURT:  Okay.  Look at the second one, then.  The

23  instructions have employee of the state and not the county.

24  Okay.  That's to deal with the first question.

25          Also, do we go with your note on personal information
```

1  or do we go by the Driver's Privacy Act of 1994?  What I'm

2  surmising is that the driver's act makes your point that E-mail

3  is not included.

4           So I'm telling them you should follow my instructions

5  as to what constitutes personal information.  I think an

6  explanation is called for.  So I said although the Driver's

7  Privacy Act does not specifically mention E-mail, the act

8  provides a non-exhaustive list of personal information by using

9  the term "including."  The Court has determined that E-mail is

10 personal information.

11          You object, obviously, to me having given that to

12 begin with, but preserving that objection, is there anything

13 wrong with the wording as I have put it down?

14          MR. N. HANLEY:  Well, I don't know how I can say that

15 the wording is okay if I don't agree with the wording.

16          THE COURT:  What I mean is I haven't expanded what

17 was previously ruled in any way is what I guess I'm wanting to

18 make sure.

19          MR. N. HANLEY:  Which question again?

20          THE COURT:  Okay.  Just go ahead and state your

21 objection to No. 2.

22          MR. N. HANLEY:  I object to --

23          THE COURT:  It telling them that E-mail a personal

24 information.

25          MR. N. HANLEY:  -- that it's included, yes.

```
 1              THE COURT:  Because you believe it should be a

 2   factual issue and not a legal determination.

 3              MR. N. HANLEY:  Yes, and it's not included in the

 4   statute.

 5              THE COURT:  And also you object because you say even

 6   the legal determination is incorrect.

 7              MR. N. HANLEY:  Right.

 8              THE COURT:  Okay.  I'm going to give No. 2.  We'll

 9   leave No. 1 with a question mark beside it.

10              And what time are they coming back?

11              THE CLERK:  8:30.

12              THE COURT:  8:30.  So why don't we hear from you by

13   8:00 in the morning if you believe that's incorrect and what

14   the appropriate answer should be if you believe that's

15   incorrect.

16              MR. N. HANLEY:  Okay.

17              THE COURT:  You can do that by E-mail to Beth.

18              MR. N. HANLEY:  Beth.

19              THE COURT:  And the prosecutor.

20              MR. N. HANLEY:  Okay.

21              MR. BORDENKIRCHER:  Should we file a response, too?

22              THE COURT:  Sure.  Because I just pulled that off the

23   top of my head.  I know the sheriff is considered a state

24   office, and I'm assuming the License Commission --

25              MR. BORDENKIRCHER:  It says it on the Web site it is,
```

```
1    but we'll double-check.

2            MR. N. HANLEY:  I know it's not a constitutional

3    office like the sheriff's department.  I'd just like to look

4    into it.

5            THE COURT:  Okay.  All right.  Let me think.  There's

6    something else.  Oh, 9:00 o'clock tomorrow, you are going to be

7    ready to go forward at 9:00 o'clock in the morning on the

8    arguments.  Everybody will be here and ready.  Okay.  I'm

9    thinking that we shouldn't do them in there because my jury can

10   hear everything that goes on if you are in front of a

11   microphone.

12           Do you have a suggestion for that?

13           THE CLERK:  Do you want to move to another courtroom,

14   Judge Butler's courtroom?

15           THE COURT:  Actually, what I was thinking was having

16   the jury deliberate downstairs -- is there any other juries

17   going on at this time?

18           THE CLERK:  No, ma'am.

19           THE COURT:  Can you take the stuff downstairs and let

20   them deliberate downstairs?

21           THE CLERK:  It would be a close -- it's not going to

22   be closed off because the jury deliberation room is two doors.

23   It's a long hallway.  You can't close them off.  I could put

24   them in Judge Butler's jury deliberation room.

25           THE COURT:  Is there a lot of stuff?
```

1    THE CLERK:  There are notebooks and the exhibits and

2  the computer and not -- it's not that I can't do it.  I can do

3  it.  It can be done, I guess, I should say.

4    THE COURT:  Well, it might be easier for us to move.

5    THE CLERK:  Probably, yes.  We've got their board and

6  everything that they can write in.

7    THE COURT:  We'll do this in Judge Butler's, I guess.

8    THE CLERK:  He's not usually not here on Thursday.

9    THE COURT:  All right.  So we'll do it in Judge

10  Butler's courtroom.

11    MR. BORDENKIRCHER:  So we'll meet up in Judge

12  Butler --

13    THE COURT:  At 9:00.

14    MR. KNIZLEY:  Is Ms. Yeager required to be there?

15    THE COURT:  No.

16    MR. BORDENKIRCHER:  You can come in you want.

17    THE COURT:  Thank you.  Have a good night.

18    [Recess.]

19

20

21

22

23

24

25

1  STATE OF ALABAMA)
                :
2  COUNTY OF MOBILE)

3

4         I, Melanie Wilkins, do hereby certify that the above

5  and foregoing transcript of proceedings in the matter

6  aforementioned was taken by me in machine shorthand, and the

7  questions and answers thereto were reduced to writing under my

8  personal supervision using computer-aided transcription, and

9  that the foregoing represents a true and correct transcript of

10 the proceedings upon said hearing.

11

12        I further certify that I am neither counsel nor

13 related to the parties to the action, nor am I in anywise

14 interested in the result of said cause.

15

16

17
                         s/Melanie Wilkins
18                       Melanie Wilkins
                         Registered Merit Reporter
19                       Certified Realtime Reporter
                         Official Court Reporter
20                       United States District Court
                         Southern District of Alabama
21                       113 St. Joseph Street
                         Mobile, Alabama  36602
22                       (251) 690-3371

23

24

25